252

**GROSJEAN et al. v. PANTHER–PANCO RUBBER CO., Inc.**
No. 3508.

Circuit Court of Appeals, First Circuit.
June 24, 1940.

Albert L. Ely, of Akron, Ohio (Robert L. Thompson and Roberts, Cushman & Wood-

berry, all of Boston, Mass., on the brief), for appellants.

Melvin R. Jenney, of Boston, Mass. (Burton W. Cary and Fish, Hildreth, Cary & Jenney, all of Boston, Mass., on the brief), for appellee.

Before MAGRUDER and MAHONEY, Circuit Judges, and FORD, District Judge.

FORD, District Judge.

This is an appeal from a decree of the District Court dismissing a bill of complaint after holding invalid patents issued to the plaintiff James E. Grosjean, and denying claims contained in the bill for infringement of United States Trade Mark Registration Nos. 149,142 (December 6, 1921), 285,219 (July 21, 1931) and unfair competition.

Two patents are involved in the present appeal. These are United States patent No. 1,687,441, issued October 9, 1928 (hereinafter referred to as the 1928 patent), and No. 1,650,511, issued November 22, 1927 (hereinafter referred to as the 1927 patent). Title to these patents is admitted to be in the original plaintiffs, James E. Grosjean, Pearl G. Maire and Fred W. Cook. The Lima Cord Sole and Heel Company, founded by the plaintiff Grosjean (hereinafter referred to as the Lima Company), was made a plaintiff as owner of the exclusive license under the patents and, because of the death of the plaintiff Grosjean shortly before trial, the other plaintiffs, Nannie A. Grosjean and Pearl G. Maire, as executrices, were substituted. The defendant is a Massachusetts corporation with its principal place of business in Chelsea, Massachusetts.

The patents relate to shoe soles and heels and involve the use of cords or threads in rubber compound and particularly cords on end which are embedded in the rubber at right angles to the wearing or tread surface so that the ends and not the sides of the cords take the wear.

### The 1928 Patent (1,687,441).

This patent describes a tread material for shoes and the method for making the same. The objects of the invention, the specification states, were to provide a novel and improved inexpensive material which possessed tough and wear-resisting properties adapted for use in making soles and to provide a method whereby such material could be produced from the trimmings or waste incident to the manufacture of cord and fabric tires for automobiles, such trimmings or waste usually consisting of scraps or remnants of strips of cord or fabric stock having the cords thereof impregnated with uncured "friction" or high grade rubber cement and the assembled cords covered by a thin coating of uncured rubber. This waste product from the automobile tires is called "friction scrap"—textile material coated with rubber. The patentee further states, "the present invention enables masses of such trimmings or refuse having the cords extending promiscuously therein, to be treated in a manner which will re-arrange the cords so that most of them extend in the same direction in a sheet produced from such mass; and such sheet having the cords so arranged therein, after being cut, shaped or otherwise formed according to the tread surface or other article to be made therefrom, is cured, as the result of which the friction and rubber associated with the cords are vulcanized, thus strongly uniting the cords and producing a material which possesses great strength, toughness and wear-resisting properties".

A mass of such waste material in which the cords extend promiscuously is passed through a "cracker" such as is used in tire factories for tearing apart new rubber. A "cracker" is a machine with large corrugated rolls rotating at different speeds. It is ordinarily used to perform the first operation on baled rubber. It changes the bale form into a rough sheet, at the same time washing out certain impurities. The cracker has the effect of rearranging the cords in the material so that they will extend mostly in the same direction, longitudinally with the mass. As a result of the cracking operation a sheet is produced with the cords extending in the same direction, longitudinally with the sheet. The passage of the sheet through the cracker is repeated a sufficient number of times to produce the desired thickness. The sheet of material is then passed through smooth rolls (a calender) and reduced to a uniform thickness. By this latter process the cords are also more nearly made to extend in the same direction, longitudinally with the sheet. The sheet then is cut across the cords into strips and assembled so that the cords are presented on end. As the specification states: "the strips cut in this way are then assembled * * * so that their cut edges will form the front and back of the tread or sole in consequence of which the

ends of the threads will be presented to the surfaces of the structure, either or both of which may be utilized as a wear surface". When the sole is constructed from these strips it is vulcanized. This produces the finished sole.

There are three claims in this patent and all are in suit. Claim 1, a method claim, is as follows:

1. The method of making a tread surface which comprises subjecting a mass of uncured waste cord or fabric tire stock consisting wholly of uncured friction coated and impregnated cords extending promiscuously therein to a drawing action to rearrange the cords so that most of them are caused to extend in the same direction and to distribute the cords loosely and uniformly while maintaining the cords of substantial length, rolling the resulting product to form it into a smooth sided sheet having most of the cords extending longitudinally thereof, cutting such sheet transversely to form strips, assembling said strips side by side so that most of the cords therein extend in the same direction in all the strips and to form a tread wherein most of the cords are presented endwise to the tread surface, and vulcanizing the assembled strips to bond together elastically the friction coated and impregnated cords composing them and to unite the strips.

Claims 2 and 3 are directed to the finished product. Claim 2 is for a "sheet of material" of the character described, and claim 3 is for a "tread for boots and shoes".

### The 1927 Patent (1,650,511).

The 1927 patent is for a heel or tread member for boots and shoes made from the material obtained by the method discussed in the 1928 patent. The specification of this patent is very similar to that of the 1928 patent.

The material is put through a cracker and following this, it is put through smooth faced rolls in order to rearrange the promiscuously extending cords in the same direction. The material is then forced through a so-called tube machine, such as that commonly used in plants producing rubber products in order to produce a strip of material having the cords, threads, or fibers, extending longitudinally with the strip. Sections of the strip are then cut off on lines transverse to the lengths of the cords to form the tread bodies for the heels. An upper body of the same shape as the tread body is cut from the sheet as it comes

from the smooth faced rolls and superimposed on the tread body. In this element the cords or fibers are substantially parallel and it serves as a backing for the tread portion of the heel. After superimposing the two bodies a border of rubber compound is placed around the two bodies and the whole is placed in a mold and vulcanized to form the completed heel.

Claims 1, 2 and 4, all product claims, of the 1927 patent, are in suit. Claims 1 and 2 are directed to a rubber heel or tread member having the tread forming body composed of loose fibers with their ends presented endwise to the tread surface. Claim 4 discloses, in addition to a lower tread forming body, an upper body superimposed on it, which the patentee asserts is a nail holding body.

The Lima Company has been manufacturing cord-on-end soles with commercial success for a great many years. From its beginning in 1920 it made cord-on-end soles from new material or new friction. Scrap friction was introduced for the first time in 1925. In 1929 the materials used to manufacture this type of sole were of two kinds (1) new friction stock—a flatwise friction which was turned on end in the process of manufacture and was a cord fabric which the Lima Company usually purchased from the Firestone Tire & Rubber Company, and (2) friction scrap-trimmings from waste fabric material such as automobile tires. Each type of material in 1929 was used in about one-half the total production of soles. From that time on the usage of new friction stock, which was relatively expensive, declined rapidly so that in 1937 about 99.35 per cent of friction scrap was used in the Lima Company's production.

The defendant began commercial production of cord-on-end soles in 1936 with a tread surface of friction tire stock. In its process, as in that of the Lima Company, the friction scrap is subjected to a cracking operation so that the cords are loosely aligned substantially in the same direction. After this process the defendant makes a smooth sided sheet of the material in smooth faced rollers. The sheet is pleated in accordance with a process disclosed in a patent for making a tread member issued to one Quinn, No. 1,935,519, and is then split in a belt-knife splitter to produce the surfaces for the tread of the sole.

The commercial product of the Lima Company does not employ the pleating

method to produce the tread surface, that being produced by cutting strips from the sheets of material. (Maranville, 1925, 1,548,052.) Unlike disclosures in the 1928 patent, other ingredients are added in the manufacturing process, by both the defendant and the Lima Company, such as carbon black, zinc, sulphur, clay and new rubber. Also, scrap left over from the sheets after the soles have been cut is added in the second cracking operation. The ingredients mentioned are also put in by means of a master-batch so-called during the second cracking operation and comprise about 11 per cent of the whole stock. They are added to shorten the cure or vulcanizing time, improve the stock from an aging standpoint, and provide color. The rubber is used as a carrier for the ingredients.

The Lima Company also manufactured a heel following the disclosures of the 1927 patent. The heel consisted of a tread portion, the wearing side with its cords on end. The backing of this heel is made of thick layers of this aligned cord, two lengthwise and one crosswise. It makes some of its heels with borders and some without. Also, some of the heels are made with nail holes and steel washers and some without. The defendant company also makes a heel with the tread element made from friction scrap, with the ends presented to the tread surface and this backed by two layers of the same material with the cords parallel to the tread. The defendant's heels have no nail holes or washers.

The defendant contends that both the 1928 and 1927 patents here in suit are invalid because of anticipation by, and lack of invention over, the prior art, and relies on the following references: Pratt, 769,324 (1904); Pratt, 792,555 (1905); Pratt, 796,-930 (1905); Collier, 1,000,781 (1911); Stedman, 1,482,952 (1924); Beldam (British) 21,415 (1914); Price, 1,162,396 (1915); Montgomery, 1,249,292 (1917); Mead, 1,517,221 (1924); and particularly on a patent issued to the deceased plaintiff Grosjean in 1919, now expired, No. 1,297,-834. The defendant argues that the only difference between the Grosjean patent of 1919 and the 1928 patent is that the product in the former is made from virgin friction and in the 1928 patent from scrap friction.

### The Prior Art.

The Grosjean patent issued March 18, 1919, No. 1,297,834, and which was not cited by the Patent Office against either the 1928 or 1927 patents, discloses a sole for boots and shoes in which the "tread portion * * * includes regularly arranged fibrous strands which are presented endwise to the tread surface".

Pratt, No. 792,555, discloses an invention relating to elastic treads for boot and shoe heels and soles composed of material with the "threads or strands of textile material embedded in the rubber body of the tread, the ends of the strands being presented at the tread surface".

Collier, No. 1,000,781, treated individual short lengths of thread with a thin solution of rubber and then mixed them with dough rubber in a mixing mill. This patent taught that this mixture of threads and dough could be rolled out into sheets and, the flexible sheets used to manufacture tires, boot and shoe soles, and other similar articles. Collier stated in his specification that "during the rolling of the material into sheets the threads tend to arrange themselves with their lengths in the direction of rolling so that the sheet has less elasticity and greater tensile strength in this direction than in the transverse direction".

Mead, No. 1,517,221, also discloses that if rubberized fibrous material is shredded by passing it through a cracker and then passed through a calender, the calendering operation tends to align the threads of fibrous material in the direction of the length of the calendered sheet. This patent also disclosed that with the above and the usual vulcanizing agents a suitable material was produced for treads, such as matting, soles, heels, and tires.

Montgomery, No. 1,249,292 (Lima Company's exclusive licensee), describes a tread body which presented to the surface the ends of the fabric and, also, the use of worn out tire casings in making treads.

Stedman, No. 1,482,952, discloses the use of friction scrap for the manufacture of flooring; also, if friction scrap is passed through a cracker the cotton fiber is not disintegrated and a mat is produced. The evidence showed that if this mat were passed through a calender, a sheet similar to that of the Lima Company and the defendant would be obtained.

Beldam (British), No. 21,455, discloses the use of friction scrap in the manufacture of shoe soles.

It is undisputed that long before the patents in suit were issued to Grosjean there was an abundance of waste material

from the manufacture of cord automobile tires known as "cord friction scrap".

■ Upon consideration of these references, it appears that the features disclosed in claim 1 of the 1927 patent were old. Claims 1, 2 and 4 of this patent are broad claims directed to "tread members". They are not limited to the structural features of a heel. The important structural feature in these claims is the cord-on-end tread construction. It might be equally used for any other tread body as a sole or matting. The heel is only one kind of tread member—"the environment" in which the product here is to be used. Ford Motor Co. v. Parks & Bohne, 8 Cir., 21 F.2d 943, 946. A "heel" was "the useful purpose to which the patentee intended his device to be devoted". It was an introductory clause of the claims. Stearns & Co. v. Russell, 6 Cir., 85 F. 218, 224, certiorari denied 171 U.S. 689, 19 S.Ct. 886, 43 L.Ed. 1179; In re Dawe, Cust. & Pat.App., 53 F.2d 543, 544; Braren v. Horner, Cust. & Pat.App., 47 F.2d 358, 363, 364; Walker on Patents, Deller's Ed., Vol. II, Section 274, Page 1271.

Even if it be assumed that claim 1 is limited to a heel, yet Pratt discloses the same construction—tread bodies in heels with the ends of the strands of cord presented to the tread surface. Thus it is clear that heels of this cord-on-end construction were old in 1927 and not even a new use is suggested by the introductory words of the claim.

These claims are very closely related to the 1928 patent which involves a "sole" or tread member. Grosjean in his 1919 patent describes a sole for boots and shoes composed of rubber with independent fibrous strands, "e. g. cord or twine * * * presented endwise to the tread surface". There is little doubt that the cords in the Grosjean 1919 patent were loose as the patentee claims in the 1927 patent. Claims 1 and 2 of the 1927 patent are similar and claim 4 discloses a backing material of unwoven textile threads which is shown in the Grosjean 1919 patent. The claimed advantageous nail-holding feature which is mentioned in the specification and now claimed as one of the structural elements of a heel appeared in some of the claims in the original patent application and was later abandoned. It is disclosed in a patent issued to the plaintiff Grosjean in 1922, No. 1,439,547 (page 2, lines 51–56). It was old. It did not involve any new structural feature upon which patentability could be based.

■■ The product claims 2 and 3 of the 1928 patent are similar and very closely related to the product claims of the 1927 patent. Claim 2 is for a "sheet of material" and claim 3 for a "tread for boots and shoes". These claims clearly read on the disclosures of the Grosjean 1919 patent. These claims disclose the placing of strips of material side by side so that the cords are on end from the tread surface before vulcanizing. The 1919 Grosjean patent describes this same formation as a "tread portion * * * composed of juxtaposed transverse units". We conclude that the references cited, Grosjean and Pratt, clearly anticipated product claims 2 and 3 of the 1928 patent and 1, 2 and 4 of the 1927 patent. They are invalid.

Claim 1 of the 1928 patent discloses a method claim. This claim is regarded by the plaintiffs as the most important claim in the case. The plaintiffs argue in their brief, to prove invention,

"Grosjean recognized that in the cord-tire friction scrap were the two elements which he needed to make his sole, the rubber and the cotton cords, but the condition in which this waste material was available apparently prohibited its use for the making of 'Cord-on-end' soles. The cords were all tangled and matted together. * * * If this material was to be used * * * some means must be found by which the majority of the cords could be untangled, straightened out and arranged in uniform direction while still in the mass of rubber. * * *

"Grosjean subjected this waste material to a wholly new treatment to produce a wholly new result, i. e., a rubber sole having endwise cords loosely arranged, scattered or peppered through the sheet in no defined arrangement of parallel rolls and files. * *

"Grosjean converted the mass of friction scrap into the new and improved 'Cord-on-end' construction by the use of a machine known under the name of a 'cracker', * * *.

"Grosjean discovered that if the rolls of the cracker were spaced apart * * * and if the rolls were run at different speeds, the bits of cord fabric embedded in rubber, * * * would separate into individual cords, the tangles and twists of the cords would be removed, and the majority of the cords would be brought into substantial alignment."

■ The steps set forth in this claim as necessary for transferring the mass of cord friction scrap into the finished sole are (1) the cracking operation; (2) the rolling of the rough sheet to form it into smooth side sheet with the cords longitudinal with the sheet; (3) cutting and placing the strips side by side; and (4) final curing. The plaintiffs do not contend that crackers, calenders, cutters, and vulcanizers were not old but they argue, as stated above, that no one ever regulated a cracker so that it would separate pieces of cord fabric into pieces of individual cords and align them without destroying them. This contention is untenable in view of the prior art. Stedman disclosed that any uncured friction scrap passed through a cracker does not disintegrate the cotton fiber and produces a mat. The evidence of the defendant's expert, Reiman, showed that if the mat were passed through a calender, a sheet would be produced with a substantial alignment of the fibers. This fact was known to the art. Collier also taught that during the rolling of the material he employed (lengths of thread with a thin solution of rubber mixed with dough rubber) the threads tend to arrange themselves in the direction of the rolling. Mead may be referred to as stating that loose fibrous stocks can be broken up by passing them through a cracker and if passed through a calender "the calendering operation tends to align the shreds of fibrous material in the direction of the calendered sheet * * *". It appears from the art that crackers and calenders, which were old and standard machinery, would separate pieces of cord fabric into individual cords and align them without destroying them,—the result that the plaintiffs claimed involved inventive genius. The claim of the plaintiffs that the patentee Grosjean used crackers and rollers in a manner different from his predecessors, in that he spaced the rollers differently and ran them at different speeds, is not indicative of any mode of operation that was not disclosed in the prior art. The plaintiffs assert that claim 1 of this 1928 patent covers a complete unitary process performed upon waste material to convert it into a new and useful product and that even if the elements of the combination used were old as they were here, the union of those elements to produce a new result is invention. The difficulty here is that the facts are incompatible with the contention the plaintiffs make that new results were produced. None was produced.

The waste product utilized here to make soles and heels was well known to all; the machinery used was old; the art, long before Grosjean in his patents, discloses that cords may be aligned in the same direction or longitudinally with the mass by cracker and calender operations; sectioning and assembling the strips side by side involved nothing new. The patentee discloses here an aggregation of old and known steps to construct soles substantially similar to those already known in the art. Such an aggregation is not patentable when no new and useful result is produced and mere aggregation is not invention either in processes, machines, or manufactures. (Walker on Patents, Deller's Ed., Vol. I, Section 42, p. 218.) What the patentee actually did here was to use old devices for analogous purposes. This is not invention. (Walker on Patents, Deller's Ed., Vol. I, Section 43, p. 226 and cases cited.) The aggregation did not perform nor produce any new or different function or operation than the elements that composed it had already performed or produced. Cf. Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed. 1008; Tropic-Aire, Inc., v. Cullen-Thompson Motor Co., 10 Cir., 107 F.2d 671, 673. Each of the steps disclosed here reflects a function previously performed. There is no joint function performed to produce a new result, as the plaintiffs contend in their brief, that would make the aggregation patentable. The court stated in Hailes et al. v. Van Wormer et al., 20 Wall. 353, 372, 87 U.S. 353, 372, 22 L.Ed. 241, 249, and it is applicable here: "No new operation is given to it by the combination. * * * Each [device] produces its appropriate effect unchanged by the others. That effect has no relation to the combination; in no sense can it be called its product." Bauer Bros. Co. v. Bogalusa Paper Co., 5 Cir., 96 F.2d 991, 994, 995.

■ In view of these conclusions, it is unnecessary to consider the commercial success of the Lima Company on the question of invention. Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 55 S.Ct. 449, 79 L.Ed. 997; Premier Machine Co., Inc., v. Freeman, 1 Cir., 84 F.2d 425.

■ Claim 1 of the 1928 patent is invalid.

Having reached the conclusion that both the 1927 and 1928 patents are invalid, it is

unnecessary to consider the question of infringement.

## The Trade Marks.

The court below in considering the alleged infringement of trade marks numbered 149,142 and 285,219 found as a fact that on December 6, 1921 the Lima Company registered as its trade mark the words, "GRO CORD", the letters "GRO" appearing above the letters "CORD". The letters are shown in block capitals, made to simulate cord or twine. The words are flanked by two arrows bent to a semi-circle. This is Registration No. 149,142. In the registration it is stated: "no claim being made to the exclusive right to the use of the word 'Cord' apart from the mark shown in the drawing."

On July 21, 1931, the Lima Company received registration of another trade mark, numbered 285,219. It consists in part of the words, "Raw Cord By Gro Cord". The words "Raw Cord" are in large capitals and over them is represented a piece of rope or twine. Underneath the words "Raw Cord" appears just the word "By", and underneath that, the words, "GRO CORD" flanked by two arrows bent in a semi-circle, as in the corporate plaintiff's earlier trade mark. Again it is stated: "no claim being made to the exclusive right to the use of the words, 'Raw Cord' and/or the word 'Cord' apart from the mark shown in the drawing."

On December 5, 1922, the defendant registered as its trade mark, "PANCORD" appearing in large capitals. It uses on its product the same word in script.

These findings of fact were fully justified by the evidence. It further appears from the evidence that the defendant divided the word "PANCORD" so that, in its advertisements and on its products, the word appeared as "PAN CORD". It is the contention of the Lima Company that "it has utilized the name 'RAW CORD' for soles and heels made by the patented process and it asserts that the utilization of script and the division of the defendant's trade mark 'PANCORD' into 'PAN' and 'CORD' were clever ruses by which the word 'PAN' could easily be mistaken for 'RAW'".

The lower court found that "the matter surrounding the corporate plaintiff's trade mark and that of the defendant resemble each other not at all, and in view of the express disclaimers heretofore recited, no infringement appears." [26 F.Supp. 351.] Cf. Hutchinson, Pierce & Co. v. Loewy, 2 Cir., 163 F. 42. We agree that the facts which were properly found, admit of no other conclusion than that there was no technical trade mark infringement by the defendant. The evidence concerning some confusion with respect to the above products of the Lima Company and the defendant, which is discussed a little more in detail below, could easily be attributed to the presence of the word "cord" in both trade marks, and as to the use of which, apart from the mark shown in the drawing, a disclaimer had been filed.

## Unfair Competition.

The plaintiffs charge that the defendant sought to pass off its goods as those of the Lima Company and deceived many who were best equipped to recognize differences in the goods. In addition to its contention that it did this by infringing its trade marks, which has been previously discussed, the Lima Company contends it had used the "catchy" phrase "cord-on-end" in its advertising to designate its entire line and that this term was the principal feature to which attention was directed in representing its product to the public. The Lima Company used this term in its advertising for about seven years before the defendant commenced commercial production in the year 1936. Lima Company further contended that "cord-on-end" acquired a secondary meaning identifying soles and heels with the Lima Company. The defendant's product is also described in its advertising as a "cord-on-end" product and this term is also stamped on the soles produced by it. The plaintiffs introduced evidence of several instances of confusion on the part of the trade between Lima Company's product and that of the defendant.

It is clear that "cord-on-end" is purely descriptive of the structure of the sole put out by both the Lima Company and the defendant. The Lima Company did not have any trade mark on "cord-on-end". The term applies equally to the product of the 1919 expired Grosjean patent discussed above. The following language used by the court in the case of Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73, is applicable here: "Since during the life of the patents 'Shredded Wheat' was the general designation of the patented product, there

passed to the public upon the expiration of the patent, not only the right to make the article as it was made during the patent period, but also the right to apply thereto the name by which it had become known. * * * 'there must also necessarily pass to the public the generic designation of the thing which has arisen during the monopoly.'" Singer Mfg. Co. v. June Mfg. Co., 163 U.S. 169, 185, 16 S.Ct. 1002, 41 L.Ed. 118.

The Lima Company's contention that the term "cord-on-end" has acquired a secondary meaning and it has come to mean its product is without merit. The court in the Kellogg case, 305 U.S. at page 118, 59 S.Ct. at page 113, 83 L.Ed. 73, said that in order to establish a secondary meaning of such a term as "cord-on-end" it must be shown "that the primary significance of the term in the minds of the consuming public is not the product but the producer". The conclusion warranted from the evidence here is that the term "cord-on-end" is associated with soles and heels rather than with any one producer. Both products were similar in·appearance. The evidence of the advertising of the Lima Company and the testimony of the single shoe dealer, Hanlon, did not necessitate a finding that the primary significance of the term "cord-on-end" is the Lima Company. The plaintiffs failed to present sufficient evidence in this direction to sustain the burden imposed upon them.

■ The only obligation the defendant had here was that pointed out in the Kellogg case, 305 U.S. at page 119, 59 S.Ct. 109, 83 L.Ed. 73, to identify its own product lest it be mistaken for that of the Lima Company. That obligation we think the defendant has fulfilled. There was no evidence the defendant used any marking in its advertising for the purpose of deceiving the public nor was there any mark or advertising that would cause any real or substantial confusion between the products. To be sure, there was some confusion, in sporadic cases, but this could not be associated with any deceitful advertising or any failure on the defendant's part to identify its product as its own. There is no assurance of any sort that this same confusion on which the Lima Company relies would not exist even if the defendant did not use the term "cord-on-end". The products of both are similar in appearance and some confusion is bound to arise due to inattention or other causes not connected with any culpable conduct of the defendant. In our opinion the defendant has used all reasonable means to prevent what little confusion the evidence shows existed. Armstrong Paint & Varnish Works v. Nu-Enamel Corp. et al., 305 U.S. 315, 59 S.Ct. 191, 83 L.Ed. 195, cited by the appellants, is not applicable to the facts in the present case. That case points out (305 U.S. at page 320, 59 S.Ct. at page 194, 83 L.Ed. 195): "Defendant admitted 'that the name "Nu-Enamel" has come to mean and is understood to mean, throughout the United States, * * * the plaintiff and plaintiff's products only * * *.'"

Further, the court there found that the evidence justified that concession. That is not the case here. Also, in that case the term "Nu-Enamel" was held to be a valid registered trade mark. The court in the Kellogg case, 305 U.S. at page 122, 59 S.Ct. at page 115, 83 L.Ed. 73, stated: "Kellogg Company is undoubtedly sharing in the goodwill of the article known as 'Shredded Wheat'; and thus is sharing in a market which was created by the skill and judgment of plaintiff's predecessor and has been widely extended by vast expenditures in advertising persistently made. But that is not unfair. Sharing in the goodwill of an article unprotected by patent or trademark is the exercise of a right possessed by all—and in the free exercise of which the consuming public is deeply interested."

This language seems peculiarly applicable to the situation presented by the facts in the present case. Cases involving the charge of unfair competition must be determined by a study of the facts presented in each case and after review of the facts here, we agree with the conclusion of the District Court that the plaintiffs are entitled to no relief based on the charge of unfair competition.

The decree of the District Court is affirmed, with costs to the appellee.