## ALEXANDER YOUNG DISTILLING CO. v. NATIONAL DISTILLERS PRODUCTS CORPORATION.

### No. 688.

District Court, E. D. Pennsylvania.

Sept. 8, 1941.

See, also, D.C., 33 F.Supp. 334.

Mayer, Magaziner & Brunswick, of Philadelphia, Pa., and Richards & Murray, of Chicago, Ill., for plaintiff.

Morgan, Lewis & Bockius, of Philadelphia, Pa., and Breed, Abbott & Morgan, of New York City (W. Heyward Myers, Jr., of Philadelphia, Pa., and Gerald J. Craugh, of New York City, of counsel), for defendant.

KALODNER, District Judge.

This is a trademark infringement and unfair competition suit, tried before me without a jury. The complaint alleges that the plaintiff, a Pennsylvania corporation, owns a valid and subsisting trademark, Y.P.M., which it uses in connection with its manufacture, sale and distribution of whiskey; and that the defendant, a Virginia corporation, uses a trademark PM in connection with its manufacture, sale and distribution of an identical product, whiskey; whereby the defendant is guilty of trademark infringement, unfair competition, and "palming-off".

The complaint contains the conventional averments of long prior use of the trademark by the plaintiff and its predecessor, and the acquisition of a "secondary significance" and "valuable reputation" by the trademark Y.P.M. for whiskey, as indicating whiskey originating exclusively with the plaintiff. The complaint also sets forth its certificates of registration of the trademark Y.P.M. for whiskey.

The plaintiff prays for temporary and permanent injunctions; for damages and accounting for profits; for costs; for the delivery and destruction of infringing labels, etc.; and for general relief.

The answer sets forth the following defenses:

(a) The plaintiff has no valid trademark in the letters Y.P.M.

(b) Defendant's rights in the trademark PM became fixed prior to any acquisition in a valid trademark Y.P.M. by the plaintiff, because of prior abandonment of the trademark, and because of defects in the plaintiff's chain of title to the trademark.

(c) Defendant is guilty of neither infringement or unfair competition.

At the trial, evidence was adduced relating to the ownership, validity, abandonment or nonabandonment, and chain of title of the trademark Y.P.M. The greater part of the testimony, however, was directed, on the plaintiff's part, to proving that the two trademarks Y.P.M. and PM were confusingly and deceptively similar, and that the public was misled into purchasing defendant's product. The defendant's testimony on that score was directed towards proving the opposite.

Preliminarily, the discussion will be devoted to this last-mentioned aspect of the case, whether or not defendant's use of the trademark PM constitutes trademark infringement and unfair competition.

This, in turn, depends for the most part upon whether or not the public may be, or is, actually deceived and misled by the alleged similarity between the two trademarks, into purchasing the defendant's products for the plaintiffs.

It is also appropriate to consider the question whether or not the trademark PM was deliberately adopted by the defendant in an attempt to benefit from any goodwill which the plaintiff's trademark might possess. For this reason, it is desirable first to review the history of the presently litigating parties, and the evolution and final adoption of their respective trademarks by each.

According to the plaintiff, the trademark Y.P.M. for whiskey was originally used by Alexander Young Company, Limited, a partnership; subsequently, by the plaintiff; and later by Margulis & Co., a cor-

poration, under the terms of an agreement made first between the plaintiff and Samuel Margulis, and later under the terms of an agreement made between owners of the plaintiff's corporate stock and Samuel Margulis; under the provisions of which latter agreement Margulis acquired all the outstanding capital stock of the plaintiff. Still later, there was an agreement between Margulis & Co. and the plaintiff, whereby the latter acquired all the assets of the former, including trademarks and goodwill of Margulis & Co.

The defendant corporation, organized in 1924, created a wholly-owned subsidiary, Penn-Maryland Corporation, in 1933.

In 1934 the subsidiary began advertising and selling three whiskeys of different grades and prices:

Penn-Maryland DeLuxe.

Penn-Maryland Imperial.

Penn-Maryland Regal.

The above whiskies were sold in Interstate Commerce from and after 1934.

In January, 1936, all assets, goodwill, etc., of Penn-Maryland Corporation were transferred to its sole stockholder, Penn-Maryland, Inc. (incorporated in 1933), and thereafter immediately to the defendant, which owned all of its stock. The whiskies were still sold under the names shown above.

In March, 1936, and in November, 1936, the defendant adopted and began to sell and distribute whiskey under two trademarks consisting of the names Penn-Maryland Private Stock and PM Bar Special, respectively. (Both of these brands have been discontinued except that small sales of Penn-Maryland Private Stock are still made in New York.)

In May, 1936, the Penn-Maryland Imperial brand having meanwhile become inactive, the defendant began considering a change in the style of the labels bearing the names Penn-Maryland DeLuxe, Penn-Maryland Regal, and Penn-Maryland Private Stock. The changes in the labels consisted of an increase in the size of the initials P and M in the compound word Penn-Maryland, and also changes in the color and style. The changed labels have been used on whiskey sold and distributed by the defendant since December, 1936, or January, 1937.

The enlargement of the initial letters PM in the name Penn-Maryland (as used on the defendant's labels) results in so disproportionate a relation between the size of the initial letters and the other letters in the name Penn-Maryland, that for the purposes of this case it may be almost assumed that the defendant uses only the letters PM on its labels, in designation of the product. This conclusion is further justified by the circumstance that, because of different coloring, the initial letters PM stand out more visibly than the other letters.

It must be noted at this point that all of the defendant's labels bear the following: "Blended by National Distillers Products Corporation, Cincinnati, Ohio".

In November, 1938, the defendant launched an advertising campaign in promotion of the Penn-Maryland DeLuxe brand, using the letters PM by themselves in the text of the advertising in referring to the product, so that it read: PM DeLuxe. In November, 1939, defendant began to use the letters PM by themselves on the back label of the Penn-Maryland DeLuxe brand. Incidentally, the defendant did not advertise the Penn-Maryland brands in 1937, and spent only $7,523 for advertising in 1938.

As far as the present situation is concerned, the defendant now uses only two Penn-Maryland brands, the DeLuxe and Regal. The DeLuxe brand, it may be mentioned, is a higher priced brand than whiskey sold by the plaintiff.

From April, 1935, to mid-1939, the plaintiff sold a single grade of whiskey under its Y.P.M. trademark. Since mid-1939 the plaintiff has sold two grades of whiskey under the trademark Y.P.M., namely, Y.P.M. Blue Label and Y.P.M. Yellow Label. The Blue Label is a higher priced brand than the Yellow Label. The two labels used by plaintiff are different in color from each other, and both are different from the color and design used upon the single grade of Y.P.M. from 1935 to 1939.

The labels used by plaintiff on both brands bear the word "Young's" immediately above the letters Y.P.M.

There is no claim by the plaintiff that the labels of the respective parties exhibit any similarity in color, or in design, and, as a matter of fact, the labels are entirely different in color and appearance.

The crux of the plaintiff's complaint is that the defendant's use of the letters PM is confusingly similar to the plaintiff's Y.P.M.

■ The first conclusion at which I arrive is that there was no attempt on the defendant's part deliberately to adopt the letters PM in order to obtain an advantage from the similarity between those letters and plaintiff's Y.P.M. trademark. Mr. MacNamara, director and vice president of the defendant company, testified on page 545 of the record, that the brand names formerly used (Penn-Maryland De-Luxe Blended Rye Whiskey, Penn-Maryland Regal, Penn-Maryland Imperial) were too lengthy and cumbersome, and that salesmen and advertising agents had criticized them, with the eventual result that the defendant simplified the names because they were influenced by the criticisms, and changed the labels by enlarging the initial letters PM of the name Penn-Maryland.

I accept the explanation. I accept it because, first, Mr. MacNamara impressed me as telling the truth in that regard; second, because the record is barren of any testimony which would warrant an inference that there was a deliberate plan to imitate plaintiff's trademark. There was no attempt to change the label in any other respect so as to make it similar to the plaintiff's; and it is reasonable to suppose that there would have been such an attempt if the defendant had set out upon a general course of imitation. Moreover, the fact that the defendant had used the name Penn-Maryland as a name both for subsidiaries and upon its labels, lends some support to a contrary view, since many firms, as shown by the record, have adopted a policy of identifying their products by the initials of their corporate or firm names.

■ The decision I have reached on this phase of the case does not determine the controversy, despite lack of any intent. McLean v. Fleming, 96 U.S. 245, 24 L.Ed. 828; Liggett & Myers Tobacco Co. v. Hynes, D.C., 20 F. 883. If the defendant's use of PM misleads the public to purchase one brand for another; if PM is actually confusingly and deceptively similar to the plaintiff's trademark, then the use of PM should be enjoined. Is there such similarity and confusion?

■ To find the answer to this question the proper place to search is in the record.

The plaintiff depended upon these factors to establish confusion:

(a) The similarity per se between the names Y.P.M. and PM;

(b) Testimony of clerks in State Liquor Stores concerning confusion;

(c) Testimony of shoppers, engaged by plaintiff, concerning confusion.

In general, the clerks testified concerning some customers who asked for PM whiskey, and after getting it stated that PM was not what they wanted, and later bought Y.P.M. However, no instance appears in which the customer did not himself or herself rectify the apparent error and ultimately obtain what was actually desired.

In one instance it was testified that a customer thought that the distributors of Y.P.M. also distributed the brand PM. Defendant's brief, p. 60, infers that the customer was a representative of the plaintiff. Plaintiff's reply brief, pp. 22, 23, says the inference is unwarranted but does not deny the fact.

So far as the shoppers are concerned, the testimony shows no instance where the shopper ultimately did not get what he asked for. In a number of cases the shoppers (who called at various taprooms) ordered a drink in this fashion: After the bartender asked what was wanted, the shopper would say: "Why—PM and soda"; or, "Why, PM and soda".

The bartender, in some instances, understood this as an order for Y.P.M. and in other instances as an order for PM; in other instances, the bartender was uncertain and asked that the order be repeated and inquired whether Y.P.M. or PM was desired.

■ I am of the opinion that the above testimony adduced by the plaintiff does not establish any confusion or deceptive similarity; or, to phrase it differently, does not establish that confusion, which is, in cases like this, a condition precedent to the granting of injunctive relief.

In the first place, the instances where any sort of confusion existed at all were relatively few compared to the number of tests made.

The testimony of the State Liquor Store clerks is inconclusive. They had all worked for considerable periods of time in the stores, and with the exception of one clerk, could remember only two or three scattered instances where a customer asked for PM and it later transpired that Y.P.M. was desired; and in all cases the customer ultimately obtained the desired product. One clerk did testify that instances of confu-

sion happened about once a week in a store catering to transient trade at 12th and Spring Garden Streets, in Philadelphia; but none of these customers, apparently, was confused to the extent of buying Y.P.M. for PM, since they all asked for Y.P.M. when a bottle of PM was shown to them (Record 324). As for the shoppers: they were evidently carrying out a policy of investigation based upon a preconceived idea by the plaintiff, that confusion might result when drinks were ordered at a bar because a customer, when asked what he wanted, might use a hesitating form of speech, and instead of asking directly for PM, might say instead: "Why—PM"; or, "Why, PM".

In the first place, there is no proof that customers normally inject the word "why" as an introductory word to an order for a drink of whiskey. In the second place, any confusion engendered by such a habit, if it existed, would only inure to the benefit of the plaintiff, since customers would get the plaintiff's brands when they asked for the defendant's brands. In the third place, the bartenders all seemed to be alert and able to recognize the verbal punctuation between the word "why" and the name PM, because it appears from the testimony that frequently the bartender asked again for the order when it was given in the fashion described.

An analysis of the experiences of the investigators employed by the plaintiff to make purchases discloses the following:

Wynne made 26 purchases. In six cases the clerk or bartender reached for PM when Y.P.M. was ordered (without any hesitation between the Y and the PM). In three of those six cases no Y.P.M. was for sale.

Monahan made 16 purchases. Only once was he offered PM.

Apgar made 15 purchases. There was only one instance that might be termed confusion.

O'Connor made 11 purchases. In no case, when he asked for Y.P.M. without hesitation between the Y and the PM, was there any confusion. In most cases, whether there was a pause between the Y and the PM or not he was offered Y.P.M. Only three times when he asked for "Why, PM" did the bartender think he ordered PM.

I do not consider that the plaintiff's testimony of the store clerks and shoppers, taken together, establishes confusion or deceptive similarity; especially in view of the important fact that no instance was established where a customer bought the defendant's brand when he wanted the plaintiff's.

In Pennsylvania Rubber Co. v. Dreadnaught Tire & Rubber Co., 3 Cir., 229 F. 560, 562, the Court said, quoting from the opinion below: "Still further, it does not appear from the evidence that there was any case in which one desiring to purchase the complainant's tire was misled into a belief by the appearance of the defendant's tire or its package that the defendant's tire was that of the complainant."

As a matter of fact, regarding the plaintiff's testimony on this phase of the case as a whole, if it should be considered as a test made by some impartial investigator attempting without bias to determine the fact whether there was confusion in the mind of the public in the purchasing of the two brands, I should say that the testimony would establish fairly well that there was no confusion, or at least that any confusion shown was negligible and unimportant.

In this connection, it may be well to advert to P. Lorillard Co. v. Peper, 8 Cir., 86 F. 956, certiorari denied 171 U.S. 690, 19 S.Ct. 886, 43 L.Ed. 1179, where it was held that minor points of resemblance in labels do not of themselves constitute infringement; and that isolated instances where purchasers failed to detect a difference in the labels, or purchased defendant's package supposing they were purchasing plaintiff's, would not justify an injunction.

In Pulitzer Publishing Co. v. Houston Printing Company, D.C., 4 F.2d 924, 927, certiorari denied 273 U.S. 694, 47 S.Ct. 91, 71 L.Ed. 844, the court in denying an injunction as between the "Post-Dispatch" of St. Louis and the "Post-Dispatch" of Houston, mentioned the circumstance that the supporting affidavits showed no instance of a lost sale or substitution, and said: "Nor, in this decision, have I overlooked the testimony that some confusion exists in the news stands, which sometimes requires clearing up. Equity sits for substance, and not for shadow, * * *."

In John Morrell & Co. v. Doyle, 7 Cir., 97 F.2d 232, at page 237, certiorari denied 305 U.S. 643, 59 S.Ct. 146, 83 L.Ed. 415, it was said: "We find in the record some evidence of confusion regarding these two brands of dog food, but such evidence, when considered in connection with the volume of the product manufactured and

sold, is to us rather insignificant. During the five year period from April, 1932, to April, 1937, the plaintiff sold nearly 102,-000,000 pounds of Red Heart dog food with a sale value of something over $7,000,000. It would be possible, no doubt, to procure some evidence of confusion or mistake whatever mark was used by a competitor in such products."

In the same vein, it was said in Grosjean v. Panther-Panco Rubber Company, 1 Cir., 113 F.2d 252, 259: "There was no evidence the defendant used any marking in its advertising for the purpose of deceiving the public nor was there any mark or advertising that would cause any real or substantial confusion between the products. To be sure, there was some confusion, in sporadic cases, but this could not be associated with any deceitful advertising or any failure on the defendant's part to identify its product as its own. There is no assurance of any sort that this same confusion on which the Lima Company relies would not exist even if the defendant did not use the term 'cord-on-end'. The products of both are similar in appearance and some confusion is bound to arise due to inattention or other causes not connected with any culpable conduct of the defendant."

And with regard to testimony of investigators or so-called "pretended" purchasers, it was said by this Circuit in Bickmore Gall Cure Company v. Karns Manufacturing Company, C.C., 126 F. 573, 576: "The proofs satisfy us that where real or pretended purchasers ask dealers for Bickmore's Gall Cure and were given Four Horse this was done by the dealers in order to reap the larger profit arising from the sale of the latter, and the latter article was accepted not because the pretended buyers were misled by the similarity of the articles, but because it was desired to test whether the Four Horse Remedy was being sold when Bickmore's was called for. In such case the substitution did not succeed because the purchaser was misled, but because the dealer was dishonest, and the purchaser was content to take an article he did not order. In cases where the test purchasers asked for the kind their employers had used, and instead of Bickmore's were given Four Horse, there is no proof that either was misled by the appearance of the package."

Both parties have cited cases involving letter trademarks. As might be expected, the plaintiff cited those in which the trademarks were held confusingly similar, and the defendant cited those in which the opposite view was taken.

■ That does not necessarily mean that the cases laying down the law as to letter trademarks are irreconcilable. A common factor must be sought which reconciles the authorities. The common factor is this: Does the trademark under attack actually cause or tend to cause confusion, or deceive or tend to deceive the public into buying the defendant's product supposing it to be the plaintiff's? In other words, similarity per se in sound or appearance of the trademark is not the true criterion. It is only a step taken in the process of analyzing or judging the true criterion. The test actually is: Will the similarity cause confusion?

The task with which a tribunal is confronted in such analysis is admirably summarized in Colburn v. Puritan Mills, Inc., 7 Cir., 108 F.2d 377, 378: "The ascertainment of probability of confusion because of similarity of trade names presents a problem not solvable by a precise rule or measure. Rather is it a matter of varying human reactions to situations incapable of exact appraisement. We are to determine, as was the District Judge, the purchasing public's state of mind when confronted by somewhat similar trade names singly presented. Is the similarity of name or dress such as to delude the public or will the prospective buyer readily differentiate between the two names? We can only contemplate, speculate, and weigh the probabilities of deception arising from the similarities and conclude as our, and the District Judge's, reactions persuade us."

As I have already indicated, the plaintiff's testimony has altogether failed to convince me that such confusion exists (between the names involved in this litigation) as to mislead purchasers into buying the defendant's product for the plaintiff's, or to justify injunctive relief.

The plaintiff's brief cites many cases where injunctions were granted in letter trademarks, but through them all runs the same thread of reasoning, that it is not similarity per se which governs the decision, but the confusion, if any, engendered by that similarity; and the presence or absence of fraudulent intent.

■ It is to be remembered that those who adopt and utilize letter trademarks must bear in mind the principle that an-

other "has the right to use its own name, or the initials thereof, as a part of its trade-mark to indicate its own goods, providing it does not do so in a manner and form to mislead the public and deceive buyers as to the identity of the goods, and lead them to believe that defendant's goods are those of complainant's manufacture; and this is the vital point of dispute between these parties." Mueller Mfg. Co. v. McDonaly & Morrison Mfg. Co., C.C., 132 F. 585, 586. This language is applicable here, notwithstanding that the Penn-Maryland subsidiaries were dissolved prior to the enlargement of the initial letters PM, since defendant's whiskies had once been sold under the name Penn-Maryland.

It is quite true that injunctions may be granted upon obviously confusing similarities in trademarks without actual proof or confusion. McLean v. Fleming, supra; Liggett & Myers Tobacco Co. v. Hynes, supra. But I know of no case in which a surface similarity has been allowed to outweigh evidence showing that in fact there is no confusion. Generally speaking, substantive evidence upon the fact of confusion or its absence should be accorded greater weight than prima facie impressions created through inspection only of the trademarks.

A somewhat different note was struck in Oil Conservation Engineering Company v. Brooks Engineering Company, 6 Cir., 52 F.2d 783, 784, where the dispute arose between the trade marks Beco and Oceco. Both names were made up of the initials of the corporate names of the parties. The opinion in this case, at least impliedly, sets up a more stringent test for infringement in cases where trademarks are composed of the initials of the manufacturer's corporate names, as opposed to cases where trademarks are not made up of initials. Note the following language (it should be borne in mind in reading the excerpt about to be quoted, that the defendant had set up a counterclaim charging infringement of its own mark Oceco by the plaintiff's mark Beco):

"There is considerable resemblance in looks and in sound; resemblance no closer has been held infringing (see review in Garrett & Co. v. [A.] Schmidt [Jr. & Bros. Wine Co.] (Judge Westenhaver, D. C.) 256 F. 943, 946), but it has come to be common to use the initials of a corporate name for a trade-mark, and in some degree 'BECO' is merely the use by the plaintiff of

its own name; there was nothing fraudulent or unlawful about the selection of this corporate name; and since plaintiff thus has a sort of prima facie, if not primary, right to use this mark, we think comparison of the two must be made on a basis less liberal to defendant than might otherwise be permitted. The defendant, having chosen for its trade-mark a condensation of its corporate name, cannot complain of similar action by the plaintiff, applied to its entirely nonsimilar corporate name, unless the result is such close resemblance as to make confusion among customers fairly probable rather than merely possible."

A case very similar to the instant case on facts and law is reported from the United States Court of Appeals for the District of Columbia, McGraw-Hill Publishing Company, Inc., v. American Aviation Associates, Inc., 117 F.2d 293. The statement of facts is taken from the opinion, page 294 of 117 F.2d:

"The McGraw-Hill Publishing Company filed a complaint against the American Aviation Associates and its President, Wayne W. Parrish, for trade mark infringement and unfair competition. The District Court dismissed the complaint. The plaintiff appeals.

"In 1928 the Aviation Publishing Corporation secured for its periodical a registration of the trade mark, 'AVIATION'. In 1929 the trade mark and the registration were assigned to the plaintiff. Since that time the plaintiff has published the magazine, 'AVIATION'. In June 1937, the defendant corporation began publishing a periodical under the name of 'American Aviation'.

"These facts outline the first issue to be considered, the charge that the defendant has infringed the plaintiff's trade mark."

The court discusses the question of trademark infringement in the following language, page 294 of 117 F.2d:

"In determining whether the words or designs create probable confusion, two methods may be followed. The marks themselves may be compared and contrasted; evidence may be introduced to show actual instances of confusion in the purchase of goods.

"In following the first method, it must be remembered that the law of trade marks is for the market place. Its purpose is to protect the several manufacturers in their respective spheres of public relations and

to safeguard the consumer by helping him get what he thinks he wants. The method starts, therefore, with placing oneself in the position of a purchaser. One should look at the plaintiff's trade mark to obtain a general impression, the impression that would be carried in the memory, and then to observe, still as a buyer, the defendant's mark to determine if it is likely to be mistaken for this 'memory trade mark' of the plaintiff.

"Under such a test we conclude that the defendant's title 'American Aviation' will not, in all probability, be confused with the plaintiff's trade mark, 'AVIATION'."

The court went on to state the differences in the appearance of the two names, in support of its conclusion that confusion between them would probably not result. The court continued on page 295 of 117 F.2d:

"The plaintiff in addition, has followed the other, more reliable method of showing probable confusion by submitting evidence that purports to reveal disorder in the mind of the purchasing public. Upon examination this evidence proves to be spotty, and for the most part manifests the mistaking of personnel in the two publishing companies. Some of it reveals errors in addressing letters. Both types of mistakes are often made even in connection with old, well established concerns. It would be well within our everyday experience to find a person rather conversant with periodicals who forgot whether 'John Jones' was associated with 'The Saturday Evening Post' or with 'Collier's' and whether the home office of the latter was New York or Philadelphia. A publisher though he has a registered trade mark cannot be protected from all of the inadequacies of human thought and memory. We believe that the record shows only one instance of a person who ordered the defendant's magazine while meaning to place a subscription with the plaintiff. And this was a renewal subscription by a clerk of an Embassy in a foreign country. Probable confusion cannot be shown by pointing out that at some place, at some time, someone made a false identification. The plaintiff did not show one instance of a newsstand purchaser receiving the magazine he did not intend to buy. Under both methods of determination, we conclude, without hesitation, that the defendant's title does

not infringe the plaintiff's registered trade mark."

Although the court in the cited case also held that the plaintiff's trademark was not arbitrary or fanciful, but descriptive, nevertheless the foregoing was one of the bases of its decision. The language has been cited because it bears upon the case sub judice, especially in its discussion of the testimony of the instances of confusion, and the court's use of both methods to determine possibility of confusion, comparison of the names and consideration of testimony.

Upon the other cause of action in the McGraw-Hill case, the charge of unfair competition, the court went on to say (page 296 of 117 F.2d): "Another cause of action is alleged by the complaint. It is the charge of unfair competition. Unfair competition in the trade name field is not concerned with intent or plan; it is enough if the acts of the defendant in light of the plaintiff's reputation result in an unfair benefit to the former. To constitute unfair competition in respect to a trade name, two elements must be present. The name must have acquired a secondary meaning or significance that identifies the plaintiff; the defendant must have unfairly used the name or a simulation of it against the plaintiff."

After deciding that it was "dubious" whether it could be found that the plaintiff has acquired a secondary meaning or significance for its title "Aviation", the court held that, even assuming that the term "Aviation" had acquired a secondary meaning for the plaintiff, nevertheless the difference in the appearance of the two magazines was such as to negative the charge of unfair competition, and said specifically (page 297 of 117 F.2d) that no "palming off" by the defendant had been shown nor had any unfair practices on the part of the defendant been disclosed.

■ I have discussed rather extensively the Mc-Graw Hill case, supra, because it is very similar to the case at bar. The evidence in the latter is absolutely barren of any testimony that the defendant has attempted to "palm off" its whiskies as those of the plaintiff. The labels of the contending parties are so different that no one could possibly mistake one for the other. There is nothing in the record which points to any unfair practice on the defendant's part, such as is necessary to

sustain the charge of unfair competition or show that the defendant has "used the name [i.e., plaintiff's trade name] or a simulation of it against the plaintiff". And finally, as I have already indicated, I do not consider that the two names, Y.P.M. and PM, are so confusingly similar or apt to cause such confusion among the trade or public as to sustain the plaintiff's charge of trademark infringement.

It may be mentioned that Mr. Margulis, a witness for the plaintiff, testified that in his opinion the drop in sale in plaintiff's whiskey, occurring subsequent to the use of PM by the defendant, was caused by the extensive advertising of the defendant's brands; but this is opinion merely from an interested witness, and no cogent grounds for the opinion are disclosed by the testimony. Moreover, the testimony shows that the defendant's sales also dropped after its adoption of the enlarged initials PM.

According to plaintiff's testimony it sold 102,329 cases of Y.P.M. whiskey from April, 1935, to June 30, 1940, of which 93 per cent was sold in Pennsylvania, approximately 4 per cent in New Jersey, 2 per cent in New York, and one-half of one per cent in Delaware, the balance being sold in the District of Columbia, and half a dozen other States.

The 93 per cent sold in Pennsylvania of the plaintiff's total sales, as stated by the plaintiff, would amount to 95,248 cases. However, the Pennsylvania Liquor Control Board (the only legal outlet in Pennsylvania) showed that it sold less than 61,000 cases of Y.P.M. liquor during the July, 1935 to June 30, 1940 period.

Total sales of the defendant's brands by the Pennsylvania Liquor Control Board during the comparable 5-year period were 69,487 cases. The defendant's sales throughout the United States from December, 1934, to July, 1940, totaled 975,000 cases.

Apropos of the plaintiff's contention that its sales showed a sharp decline after the defendant launched its advertising campaign of PM brands at the close of 1938, an analysis of its sales in Pennsylvania (since that is its principal market) in comparison with the defendant's PM DeLuxe for the comparative period is most interesting. (There were no sales of any of the defendant's other brands in Pennsylvania after 1936.)

Pennsylvania sales Y.P.M.

| | |
|---|---|
| 1938 | 20,783 cases |
| 1939 | 12,466 cases |
| 1940 (to June 30) | 5,277 cases |

Pennsylvania sales PM DeLuxe

| | |
|---|---|
| 1938 | 10,658 cases |
| 1939 | 7,220 cases |
| 1940 (to July 30) | 4,500 cases |

Thus plaintiff's sales in Pennsylvania dropped 40 per cent and defendant's sales dropped 32 per cent from 1938 to 1939.

Interesting to note also is the fact that in its next most important market, New Jersey, the plaintiff's sales rose from 1,013 cases in 1938 to 1,115 cases in 1939, while the defendant's sales of PM DeLuxe in New Jersey showed 3,083 cases in 1938 and 3,788 cases in 1939.

Considering now New York, the defendant's principal sales outlet for PM DeLuxe, its sales in that State were 19,749 in 1938 and 31,727 in 1939, an increase of 60 per cent.

The plaintiff's sales in New York were 431 in 1938 and 1,320 in 1939, an increase of more than 300 per cent.

These facts, of course, effectively dispose of plaintiff's contention that its business was adversely affected because of the defendant's use of its PM mark.

The following quotation from Larson, Jr., Co. v. Wm. Wrigley, Jr., Co., 7 Cir., 253 F. 914, 917, is particularly pertinent on this score: "Counsel, however, contend that an inference to that effect [confusion] may be drawn from Larson's testimony that after 'Doublemint' appeared his sales of 'Wintermint' materially decreased. True, but a falling off in business may result from fair as well as from unfair competition."

The defendant on its part adduced testimony by store clerks, shoppers, and others which, in general, showed no confusion between the names of the competing whiskies. I do not discuss this testimony at any length, for the reason that the plaintiff's testimony has failed to convince me that an injunction on the ground of confusion is justified in this case, but this much may be said:

The defendant's witnesses consisted of Pennsylvania State Liquor Store clerks, proprietors or clerks in retail liquor stores in other States, taproom proprietors and barkeepers in Philadelphia, and investigators employed by the defendant to visit

stores in Delaware and New Jersey. They testified without exception that in their experience they had never come across an instance of confusion between the respective brands among customers. In addition, the director of purchases for the Pennsylvania Liquor Control Board testified that he had never heard of any confusion between the brands of the respective parties.

Of and by itself, such testimony by the defendant as to lack of confusion might not be accorded great weight if the court were of the opinion that the names were confusingly similar and would be likely to cause the purchasing public to buy the defendant's brand when it wanted the plaintiff's: Hopkinson Trademarks, 4th Ed., § 203; but I do not consider that any such confusing similarity exists between the two names, despite the fact that the name of the defendant's brand, to put it mathematically, consists of two-thirds of the name of the plaintiff's brand.

Thus, for the moment omitting from consideration the testimony as to confusion or the lack of confusion, and carefully comparing the names Y.P.M. and PM in my mind, I think they are not apt to cause confusion among the purchasing public. I see no reason why anybody should think PM is the same as Y.P.M. or vice versa. Both brands are well advertised, and clerks in stores, bartenders in taprooms, and the purchasing public seem well aware that there are two brands of whiskey bearing those names. I can conceive of an element of confusion in names such as P. & G. and B. & G., because both names consist of two letters, and the first letters in each, both being labials, may easily be mistaken for each other; as might, for instance, the names Rinex and Pinex. But in the instant case, since the letter Y is missing from the defendant's trademark, my conclusion is that no such element of confusion exists (regarding the names per se) as would justify injunctive relief.

Still on the question of possible confusion, the defendant has raised a point already mentioned which is well taken. The plaintiff at present sells two brands of whiskey, respectively identified as Blue Label and Yellow Label. They are of different prices and qualities. Similarly the defendant has two differently priced brands, Penn-Maryland DeLuxe and Penn-Maryland Regal. In purchasing or ordering plaintiff's whiskey the customer must specify Blue or Yellow Label to get what he wants. In purchasing or ordering defendant's whiskey the customer must specify DeLuxe or Regal to get what he wants. Faced with such requirements, a customer is hardly likely to be given a PM whiskey when he orders a Y.P.M. whiskey.

The plaintiff has argued that the decision in the patent office, holding that PM and Y.P.M. were confusingly similar, is entitled to great weight, and cites for that proposition Century Distilling Co. v. Continental Co., 3 Cir., 106 F.2d 486. It should be remembered, however, that that case was an appeal from the order of the district court; and so far as similarity of trademarks was concerned, was an affirmance of the decision of the court below, upon findings of fact which could scarcely be reversed except for gross error.

It is a matter of common knowledge that there is frequent disagreement between District Courts and the Patent Office in conclusions reached as to confusing similarity of trademarks.

It was said in Colburn v. Puritan Mills, Inc., 7 Cir., 108 F.2d 377, 378: "Plaintiff relies heavily on our opinion in Nu-Enamel Corporation v. Armstrong Paint & Varnish Works, 7 Cir., 95 F.2d 448. But in trademark cases, even more than in other litigation, precedent must be studied in the light of the facts of the particular case."

In view of the conclusions at which I have arrived with regard to the lack of confusing or deceptive similarity in the names used by the litigants here, it is unnecessary to discuss other defenses raised, such as the attacks upon the validity, ownership or chain of title in the mark "Y.P.M." or its abandonment by disuse or transfer in gross.

The bill should be dismissed. Let an appropriate decree be submitted.