**OLD CHARTER DISTILLERY CO.,**
Plaintiff,

v.

**CONTINENTAL DISTILLING CORPO-
RATION, Defendant.**

Civ. A. No. 1386.

United States District Court
D. Delaware.

May 27, 1959.

314

Aaron Finger (of Richards, Layton & Finger), Wilmington, Del., Melvin D. Goodman, Alan S. Kuller, Alan Burton Lerner (of Chadbourne, Parke, Whiteside & Wolff), New York City, of counsel, for plaintiff.

James R. Morford and Ernest S. Wilson, Jr. (of Morford, Young & Conaway), Wilmington, Del., for defendant.

CALEB M. WRIGHT, Chief Judge.

■ This is a trademark action brought pursuant to 15 U.S.C.A. §§ 1051–1127 commonly denominated the Lanham Act.[1] Plaintiff's trademark is "Old Charter" and defendant's "Charter Oak". Both marks are used for whiskey. There are no charges of label simulation or peculiar similarities in advertising.[2] Thus, the basis of the infringement is confined solely to the two marks.[3]

Protracted litigation between the parties has preceded the immediate cause resulting principally in the rendition of a judgment of priority of use in plaintiff's favor and the establishment of the validity of the "Old Charter" mark.[4] The issues of confusing similarity and the equitable defenses of laches, ac-

1. 60 Stat. 427 ff., Act of July 5, 1946, c. 540, as amended (Comp. par. 1; Ans. par. 1). The acts which constitute trademark infringement are also alleged as unfair trade practices and unfair competition against plaintiff (P.Tr.Br. 3–4). Thus the suit is federally cognizable absent diversity and jurisdictional amount, 28 U.S.C.A. § 1338(b); L'Aiglon Apparel, Inc. v. Lana Lobell, Inc., 3 Cir., 1954, 214 F.2d 649, 654. Plaintiff, Old Charter Distillery Co., and defendant, Continental Distilling Corporation, are both incorporated under the laws of the State of Delaware.

2. Pre-trial Conf. pp. 8–9, 17–18, 97.

3. Note 2, supra.

4. Order dated May 22, 1956 wherein Rodney, J.
"Ordered, adjudged and decreed that:
"1. The principles of collateral estoppel are applicable to the final judgment rendered in said prior action in the District Court of the United States for

quiescence and estoppel remain for decision.[5]

At the outset, after a careful perusal of the case law and legal literature, the very cogent remarks of Judge Leahy are noted with approval:

"My reading in the literature has covered hundreds of cases dealing with many subjects pertaining to trade-mark infringement and unfair competition. The experts in the field have been hard put to work out a scheme among the multiple decisions. Instance after instance may be cited where decisional results are patently incompatible. A pattern of logic has failed to result, I believe, because each decision is controlled by its particular facts. This type of litigation presents fact cases. This makes it difficult to apply precedents which are conclusive. The soundness of any particular court's decision is controlled by the fidelity of the application of established legal principles to a particular set of facts for adjudication. * * * "[6]

The course thus chartered, a careful analysis of the facts is indicated.

On March 13, 1934 "Charter Oak" registration issued to defendant, Continental Distilling Corporation (Continental), a wholly owned subsidiary of Publicker Industries, Inc.[7] (Publicker). The credible evidence demonstrates that the name was suggested by Dr. Marks, an officer of Continental and his wife, Miriam,[8] and after a trademark search indicated its availability, the mark was adopted.[9] Nothing in the record indicates Continental's appropriation of the mark was tainted and anything but innocent.

The Bernheim Distilling Company (Bernheim), a Kentucky corporation, claiming use by predecessors in interest since 1874 had registered "Old Charter" on February 19, 1935.[10] It is worthy of note that Wright & Taylor, one of the prior owners in Bernheim's title registered the mark in 1909 under the Act

---

the District of Columbia, and those matters that were actually litigated and decided therein are now res judicata between the parties hereto.

"2. Said final judgment conclusively determined, in particular, the following matters which were actually litigated and decided in said action, and are res judicata in this action:

"(a) Said District Court had jurisdiction over the subject of said prior action and over the person of the defendant therein.

"(b) The trademark 'Old Charter' had priority of use as against the trademark 'Charter Oak.'

"(c) Plaintiff derived a good and valid chain of title to the trademark 'Old Charter' by virtue of good and valid assignments from predecessors in title who had used that trademark prior to the use of the trademark 'Charter Oak,' and its rights to said trademark 'Old Charter' had not been abandoned.

"(d) The registration of said trademark 'Old Charter' in 1935 in the United States Patent Office was valid and was not fraudulent."

Opinion of court is reported at 138 F.Supp. 473 (1956).

5. Pre-trial Conf. pp. 5, 6, 13–16.

6. Telechron, Inc. v. Telicon Corp., D.C. Del.1951, 97 F.Supp. 131, 150–151. The incompatibility of decisional results alluded to by Judge Leahy is exhibited by the chart set forth below:

Distilled Beverage Marks

*Determined to be Infringing:*

Dixie Dew and Dixie Belle for whiskey and Dixie Belle and Dixie Beaux for gin; Century Distilling Co. v. Continental Distilling Co., 3 Cir., 1939, 106 F.2d 486.

Old Raven for whiskey and Raven Run for whiskey; G. F. Heublein & Bro. v. Bushmill Wine & Products Co., D.C.M. D.Pa.1944, 55 F.Supp. 964.

*Determined not to be Infringing:*

P.M. for whiskey and Y.P.M. for whiskey; Alexander Young Distilling Co. v. National Distillers Products Corp., D.C.E.D.Pa.1941, 40 F.Supp. 748.

Chateau Martin for wine and Chateau Montay for wine; Eastern Wine Corporation v. Winslow-Warren, Ltd., 2 Cir., 1943, 137 F.2d 955.

7. DX 8A, 8C; Certificate of Renewal dated August 17, 1954, DX 8B.

8. N.T. 480–481, 693, 1194.

9. DX 14; N.T. 491, 492, 517, 521, 531.

10. PX 5.

of 1905.[11] This registration expired in 1929 and was not renewed.[12]

In June 1937 the present plaintiff, Old Charter Distillery Co., a wholly owned subsidiary of Schenley Distillers, Inc. (Schenley), by mesne conveyances assumed ownership of the "Old Charter" mark.[13] The Bernheim trademark file reveals that Mida's Trade Mark and Patent Bureau, Incorporated, reported in late 1936 defendant's adoption of "Charter Oak" for whiskey.[14]

In January 1938 trademark counsel for plaintiff advised defendant that its mark infringed plaintiff's "Old Charter", and requested Continental discontinue the use of "Charter Oak".[15] Thereafter when negotiation between the parties did not bear fruit, plaintiff in September 1938 averring prior use, petitioned for cancellation of defendant's registration under Section 13 of the 1905 Act (Cancellation 3436).[16] Defendant in its answer denied plaintiff's allegation of confusing similarity, the precise issue now before the court.[17] Over defendant's vigorous protest plaintiff withdrew the petition without prejudice on July 11, 1939.[18]

Subsequently, on February 14, 1940, defendant instituted a Section 13 (old) action[19] to have plaintiff's mark cancelled (Cancellation 3663). Defendant in its petition did not specifically allege that the two marks were confusingly similar; however, in response to plaintiff's request for a bill of particulars defendant stated:

"1) In answer to that part of respondent's motion for further and better statement of claim which reads, in part:

"'Petitioner * * * has failed to indicate whether or not it is relying upon the confusion in trade clause of the Statute. It is, therefore, believed that Petitioner should be required to state whether or not it contends that the mark sought to be cancelled is confusingly similar to the mark claimed to be owned and used by Petitioner.', petitioner states that it does rely upon the confusion in trade clause of the Statute." [20]

The Patent Office on July 16, 1943, sustained the petition for cancellation, finding against plaintiff on priority of use.[21] Both the Acting Examiner and the First Assistant Commissioner of Patents relied upon defendant's allegation of confusing similarity without which defendant would not have had standing to pursue the relief it sought.[22] Thus the

11. DX 6.

12. PX 59; N.T. 504.

13. PX 7.

14. DX 37A and 37B; N.T. 845–846, 1397–1398.

15. PX 12; N.T. 52.

16. PX 19; 15 U.S.C. § 93 (old), now 15 U.S.C.A. §§ 1064, 1068, 1070.

17. DX 2.

18. DX 2.

19. PX 28; 15 U.S.C. § 93 (old).

20. PX 32.

21. PX 36.

22. "It is well settled * * * that an application for cancellation must be sufficient in itself independently to state a valid cause of action, notwithstanding that the applicant for cancellation may have been charged, whether correctly or incorrectly, with a violation of the trademark rights of the registrant. * * *" Joseph Dixon Crucible Co. v. Richard Best Pencil Company, Inc., 99 U.S.P.Q. 170, 171 (Asst. Commr.1953).
"* * * Unless an opposition alleges that the opposer has used the mark, or one confusingly similar, it will be dismissed." Nims, Unfair Competition and Trade-Marks, Vol. 2, p. 794.
"* * * He must allege that the published mark is confusingly similar to his own and that it is used on goods of the same descriptive properties as those to which he applies his own mark. Further he must allege priority of use of his mark over that of the applicant and also that he is using it at the time he files his opposition, *otherwise he cannot be damaged.*" Nims, Unfair Competition and Trade-Marks, Vol. 2, p. 795. (Emphasis supplied.)

Acting Examiner of Interference stated in his decision of September 14, 1942:

"As to the question of likelihood of confusion in trade, it appears that the goods are in part identical and it likewise appears that the parties do not contend, but *in fact admit that the marks involved are confusingly similar.* Accordingly, the only question involved herein is that of priority of use as between the parties." [23] (Emphasis supplied.)

Similarly the First Assistant Commissioner of Patents in his determination on July 16, 1943 observed:

"Respondent's mark is 'Old Charter.' The mark relied upon by petitioner is 'Charter Oak.' Both are registered for whiskey, and are conceded by respondent to be confusingly similar. The only controversy between the parties relates to the question of ownership." [24]

In November 1943 plaintiff filed a bill in equity in the United States District Court for the District of Columbia for review of the Patent Office determination under R.S. § 4915 joining the Commissioner of Patents and defendant.[25] In this action, plaintiff alleged and defendant admitted that defendant had filed a petition to cancel the "Old Charter Registration" on the ground that "Old Charter" was deceptively similar to "Charter Oak" and that defendant had "priority of use and ownership of 'Charter Oak'."[26] On January 7, 1944, plaintiff instituted a precautionary R.S.

§ 4915 proceeding in this court wherein defendant answered as it had in the District of Columbia suit.[27]

On December 7, 1944, defendant sued plaintiff in this court for infringement, defendant specifically averring:

"8) 'Old Charter' is confusingly similar to 'Charter Oak'.

"9) 'Old Charter' is a colorable imitation of 'Charter Oak'.

"10) The aforesaid use of 'Old Charter' on whiskey constitutes an infringement of plaintiff's United States Trademark Registration No. 311,038 on 'Charter Oak', for whiskey." [28]

The District of Columbia R.S. § 4915 cause resulted in a reversal of the Patent Office decision; Judge Holtzoff determining priority in favor of plaintiff.[29] The Court of Appeals for the District of Columbia Circuit affirmed on December 7, 1950.[30]

Judge Holtzoff and the Circuit Court in review construed the litigants' conduct as conceding the similarity issue. Thus the District Court opinion commences:

"The defendant, Continental Distilling Corporation, is the owner of another whiskey trade-mark, to wit, 'Charter Oak.' *It is conceded that there is confusing similarity between the two trade-marks.* The controversy is as to which of the two parties has the prior right to a whiskey trade-mark embracing the word 'Charter'. * * *" [31] (Emphasis supplied.)

23. PX 34.

24. PX 36.

25. 35 U.S.C. § 63 (repealed); PX 37.

26. PX 37, PX 38.

27. DX 21; Civil Action 359.

28. PX 45; defendant on December 21, 1950 discontinued this infringement suit (C.A. 498). At no time during the six years the action was pending did defendant withdraw the aforementioned affirmative allegations.

29. PX 39; Old Charter Distillery Co., Inc. v. Ooms, D.C.D.C.1947, 73 F.Supp. 539, 540.

30. PX 43; Continental Distilling Corp. v. Old Charter Distillery Co., 1950, 88 U.S. App.D.C. 73, 188 F.2d 614.

31. Note 29, supra. It is significant to note that Judge Holtzoff's findings of fact filed on June 16, 1948, stated (PX 40):

"17. The respective trade-marks 'Old Charter' and 'Charter Oak' are confusingly similar."

and his conclusions of law (PX 40):

"11. Plaintiff is entitled to judgment, adjudging and declaring as follows:—
* * *
"(c) The trade-marks 'Old Charter' and 'Charter Oak' are deceptively similar un-

The Court of Appeals in its first sentence remarked:

"In this case two distillery companies, *conceding their registered trade-marks for whiskey to be confusingly similar,* are contending for priority. * * *"[32] (Emphasis supplied.)

On June 28, 1951, the present infringement action was commenced and since plaintiff relied on Judge Holtzoff's determination of priority, a separate trial restricted to the scope of Judge Holtzoff's adjudication pertaining to precedence of use was had before Judge Rodney.[33] On January 6, 1956, Judge Rodney sustained plaintiff's position.[34]

■ At no time has plaintiff contended that Judge Holtzoff's findings relevant to the similarity issue created an estoppel by judgment.[35] Defendant having denied plaintiff's allegation of confusing similarity and the doctrine of collateral estoppel unavailing since not pleaded,[36] the issue is in dispositive posture.

The Lanham Act in pertinent part provides:

"(1) Any person who shall, in commerce, (a) use, without the consent of the registrant, * * * colorable imitation of any registered mark in connection with the sale, offering for sale, or advertising of any goods or services on or in connection with which such use is likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods or services; * * *."

\* \* \* \* \* \*

"The term 'colorable imitation' includes any mark which so resembles a registered mark as to be likely to cause confusion or mistake or to deceive purchasers."[37]

There is no need to seek a novel test for applying the statutory provisions for Judge Leahy in Telechron, Inc. v. Telicon Corp. enunciates an eclectic standard chosen from the prevailing authority:

"The test of 'colorable imitation in commerce' suggested by the statutory prohibition is not an analytical difference between marks of two competing products when placed in

---

der U.S.Code, Title 15, Secs. 85 and 96 [now 15 U.S.C.A. §§ 1052, 1057(b), 1114, 1115, 1117]; * * *."

32. Continental Distilling Corp. v. Old Charter Distillery Co., 1950, 88 U.S.App. D.C. 73, 188 F.2d 614, 615.

33. Docket Nos. 36 and 37.

34. Old Charter Distillery Co. v. Continental Distilling Corp., D.C.Del.1956, 138 F.Supp. 473; see also note 4, supra.

35. "Mr. Goodman: The issue of confusing similarity I guess, your Honor, is technically in the case.
"* * * So that the result of it was that the parties having agreed that the marks were confusingly similar and the Courts having accepted the concession and, as a matter of fact, straight through the history you will see that every opinion of every Court always opened up with the statement, 'The marks are confusingly similar, the parties have so conceded, . . .' but since it was a concession rather than actual litigation of the issue, strictly speaking technically it did not raise a question

of collateral estoppel. So that on the prior proceeding before Judge Rodney we did not urge that defendant was collaterally estopped to raise the question of confusing similarity. We still have that issue in the case, and with that I think we go to the new issues raised by the affirmative defenses and the answer of this defendant which, as I see it, is in the first affirmative defense; it is laches, acquiescence and estoppel." Remarks of counsel for plaintiff, Pre-trial Conference, May 22, 1958, pp. 5–6.

36. Bryar v. Campbell, 1900, 177 U.S. 649, 20 S.Ct. 794, 44 L.Ed. 926; Graff Furnace Co. v. Scranton Coal Co., 3 Cir., 1920, 266 F. 798. The court assumes no position on the substantive availability of collateral estoppel; see 65 Harv.L. Rev. 818, 1952, Developments in the Law—Res Judicata; Scott, Collateral Estoppel by Judgment, 56 Harv.L.Rev. 1, 1942; Newport v. Seaboard, Civ.Action (D.C.Del.1958).

37. 15 U.S.C.A. § 1114; 15 U.S.C.A. § 1127.

juxtaposition, but whether a sensory difference will be recognized by the ordinary purchaser when he does not have the opportunity for comparison—i. e. whether a deceptive similarity exists when average buyer is unable to distinguish defendant's name or mark from his recollection of plaintiff's mark. Short of this, resemblance constituting infringement is incapable of exact definition. * * * " [38]

The test is essentially one to be applied by the court.[39] Substantial similarity and not identity is all that is necessary to constitute an infringement.[40] Proof of actual confusion is not required [41] and when introduced is scrutinized carefully.[42] Evidence of a negative character such as testimony by the trade or by consumers that they are not deceived and that the respective marks do not cause confusion, is of doubtful value.[43] A side by side comparison of the marks is afforded little weight for the products bearing the marks are rarely displayed that way in the commercial community.[44]

38. D.C.Del.1951, 97 F.Supp. 131, 142.

39. "No conclusive criteria to test the possibility of confusion are possible. See Restatement of Torts § 729. Moreover, since reliable evidence of actual instances of confusion is practically almost impossible to secure, particularly at the retail level, in the final analysis the decision must rest on the court's conviction as to possible confusion. * * * " Miles Shoes, Inc. v. R. H. Macy & Co., Inc., 2 Cir., 1952, 199 F.2d 602, 603.

"The plaintiff did not produce any evidence of actual cases of confusion in the minds of buyers and others resulting from the similarity of the trademarks. However, that is unnecessary and it has been held many times that the Court can make a finding of confusing similarity from a comparison of the mark or names themselves in the setting in which they are used by the respective parties. * * * " Williamson-Dickie Mfg. Co. v. Davis Mfg. Co., D.C.E.D.Pa.1957, 149 F. Supp. 852, 854.

See also, The Best Foods, Inc. v. Hemphill Packing Co., D.C.Del.1925, 5 F. 2d 355; Pre-trial Conf. pp. 16, 17–18, 97.

40. " 'Similarity, not identity, is the usual recourse when one party seeks to benefit himself by the good name of another.' * * * " Telechron, Inc. v. Telicon Corp., D.C.Del.1951, 97 F.Supp. 131, 143.

See also, McLean v. Fleming, 1877, 96 U.S. 245, 24 L.Ed. 828. There is infringement where the substantial and distinctive part of the trademark is copied or imitated. Queen Mfg. Co. v. Isaac Ginsberg & Bros., 8 Cir., 1928, 25 F.2d 284; Bunte Bros. v. Standard Chocolates, D.C.Mass.1942, 45 F.Supp. 478.

41. Best Foods v. Hemphill Packing Co.; Miles Shoes, Inc. v. R. H. Macy & Co., and Williamson-Dickie Mfg. Co. v. Davis Mfg. Co., note 39, supra; George W. Luft Co., Inc. v. Zande Cosmetic Co., Inc., 2 Cir., 1944, 142 F.2d 536, certiorari denied 1944, 323 U.S. 756, 65 S.Ct. 90, 89 L.Ed. 606; LaTouraine Coffee Co. v. Lorraine Coffee Co., 2 Cir., 1946, 157 F.2d 115; Barbasol Co. v. Jacobs, 7 Cir., 1947, 160 F.2d 336; Englander v. Continental Distilling Company, 37 U.S. P.Q. 264 (CCPA 1938); Nims, Unfair Competition and Trade-Marks, pp. 676, 1018.

42. Flintkote Co. v. Tizer, 3 Cir.1959, 266 F.2d 849; Miles Shoes, Inc. v. R. H. Macy & Co., note 39, supra; Eastern Wine Corporation v. Winslow-Warren, Ltd., 2 Cir., 1943, 137 F.2d 955; Alexander Young Distilling Co. v. National Distillers Products Corp., D.C.E.D.Pa.1941, 40 F.Supp. 748; Oakite Products, Inc. v. Buckeye Soda Co., 6 P.Q. 152, 20 T.M. Rep. 540.

43. Nims, Unfair Competition and Trade-Marks, Vol. 2, p. 1054.

44. "This is a question of fact to be determined with regard to the circumstances of the particular case. * * * Moreover, the test of colorable imitation is, not whether a difference may be recognized between the marks of two competing articles when placed side by side, but whether the difference will be recognized by the purchaser when not having the opportunity for comparison. [A.Y.] McDonald [& Morrison Mfg. Co.] v. [H.] Mueller [Mfg. Co.], [8 Cir.], 183 F. 972, 106 C.C.A. 312. The similarity is deceptive when it is such that the average buyer, in the exercise of ordinary care and caution in the purchase of such an article, is unable to distinguish the defendant's name or mark from his mental picture or recollection of plaintiff's mark. The test is not visual comparison, but is memory comparison.

**320**

Application of these principles presents an exceedingly difficult and close question. On the one hand, "Charter", the longer of the two words, appears in both marks. "Old" and "Oak" are both three-letter words beginning with "O" and have a somewhat similar sound. The word "Old" is commonplace among whiskey trademarks,[45] and is sometimes omitted by customers when they make their purchase.[46] Hence "Old Grand Dad" and "Old Taylor" become "Grand Dad" and "Taylor".[47]

■ There is, however, no evidence indicating that "Old Charter" has achieved this stature.[48] Moreover, it is the entire mark which is subject to legal protection.[49]

■■ The court is also aware that whiskey is sold by the drink, over the counter at bars and taverns, and these establishments are frequently noisy with a television set in operation and the din of voices, glasses and ice in the background.[50] Hence the patron does not

Nims on Unfair Competition and Trade-Marks, pp. 583, and 588, 589. * * * "
The Best Foods, Inc. v. Hemphill Packing Co., D.C.Del.1925, 5 F.2d 355, 357.
See also, Telechron, Inc. v. Telicon Corp., 3 Cir., 1952, 198 F.2d 903; Nehi Corp. v. Mission Dry Corp., D.C.Del. 1953, 117 F.Supp. 116; Williamson-Dickie Mfg. Co. v. Davis Mfg. Co., note 39, supra; Nims, Unfair Competition and Trade-Marks, Vol. 2, p. 1019.

45. As of April 1, 1958, the following bourbon whiskeys commencing with "Old" were available for consumer purchase in the Commonwealth of Pennsylvania:

| | |
|---|---|
| Old Crow | Old Mr. Boston |
| Old Dover | Old Taylor |
| Old Fitzgerald | Old Vandergrift |
| Old Forester | Old Hickory |
| Old Grand Dad | Old American |
| Old Kentucky Tavern | Old Stagg |

(Pennsylvania State Store Price List No. 68, April 1, 1958; DX 41B).

46. N.T. 1309, 1319.

47. Note 46, supra.

48. "It is true that the evidence before us shows there is confusion on the part of some of the consumers. This confusion, however, is the result of the fact that some of the purchasers call the plaintiff's oil by the name 'Quaker' rather than 'Quaker State.' The record is barren as to any confusion between the names 'Quaker State' and 'Quaker City.' Such being the case, the complainant contends that it now has the right to use 'Quaker' exclusively as well as 'Quaker State,' and asks the court to restrain all who use a trade name similar to 'Quaker' as well as those who use a name similar to 'Quaker State.' This argument is inapplicable to the facts in the case for one reason and possibly for two. First, there is no evidence that the complainant's oil was called 'Quaker' in

1919, when the defendant started in business. Hence it cannot be said that the defendant violated any rights of the complainant at that time. *The fact that the public afterwards began to call the complainant's product 'Quaker' should not be permitted to divest the defendants of any rights already acquired.* * * * " (Emphasis supplied.) Quaker State Oil Refining Co. v. Steinberg, 325 Pa. 273, 189 A. 473, 477.

49. "Each of the marks contains two words. Although the first word of each is identical, each mark must be viewed as a whole, since 'Combined they constitute a trade-mark which is the subject of protection by the law.' * * * " Nehi Corp. v. Mission Dry Corp., D.C.Del. 1953, 117 F.Supp. 116, 117.
"* * * There is not so much danger of confusion between 'Quaker City' and 'Quaker Maid.' If, however, in common use they are shortened to Quaker, as we agree they are likely to be, more or less confusion will result. This is a reason, and by itself a good reason for refusing to register one trade-mark so nearly like one already registered. The difficulty, however, is that, whether so intended or not, the effect of the ruling, if it has any effect, is to give to the defendant the exclusive use of the word 'Quaker' and to permit it alone to advertise Quaker-made candies. * * * " Loughran v. Quaker City Chocolate & Confectionery Co., D.C.E.D.Pa.1923, 286 F. 694, 698.
"* * * The registration of a trademark does not give the registrant a monopoly of every word in the trademark howsoever disposed and used." Loughran v. Quaker City Chocolate & Confectionery Co., 3 Cir., 1924, 296 F. 822, 827.

50. Jos. S. Finch & Co. v. Western Wine & Liquor Co., 99 U.S.P.Q. 145 (Commr. of Patents, 1953).

necessarily see the package nor is his order received under ideal acoustical conditions.

Countering these similarities, the connotation of the two marks is quite different. "Charter Oak" has specific reference to a purported event in history, namely, to a particular oak tree near Hartford, Connecticut in the hollow of which Captain Wadsworth is reported to have hidden the Charter of Connecticut to prevent its seizure by Sir Edmund Andros in 1687.[51] Under no reasonable stretch of the imagination can "Old Charter" be deemed to imply the same word picture.

It is not without significance that the first words of the marks differ. To some noted writers in the field this dissimilarity would alone be conclusive to a finding of no infringement.[52]

The court is also cognizant that distilled beverages are generally required to be sold to adults, and are not usually purchased by telephone or mail.[53]

The role advertising assumes in modern merchandising is not without significance, particularly in the distilled spirits area where it is widely recognized that there are certain whiskey users who buy strictly by the brand and no similarity in name or label simulation outside of patent misrepresentations will deceive or confuse this class.[54] The evidence discloses that the products bearing the contested marks are widely advertised.[55]

Restricting the determination to simply assessing the above enumerated elements would, indeed, be an arduous task. There are, however, other pertinent factors which must be considered.

Shortly after the passage of the 1905 Act four companies claiming ownership of whiskey marks encompassing the word "Charter" sought registration. The companies with their respective marks are set forth below: [56]

| Company Name | Mark |
| --- | --- |
| Wright & Taylor | Old Charter |
| Bluthenthal & Bickart | Old Charter |
| Mayer Sons & Co. | Charter Oak [57] |
| Cushman & Co. | Royal Charter |

Interference was declared and the Patent Office concluding that the marks

---

51. DX 32.

52. "* * * It has been said that when a trade-mark consists of two or more words or parts, the first part is the predominant, salient part and that therefore if the first part is copied there must be infringement but if the imitation is only of the second part, infringement is doubtful. * * *" Nims, Unfair Competition and Trade-Marks, Vol. 1, p. 680.

"Similarities in the beginning of first words of trade-marks are more important than similarities in their endings. Where the last word in each mark is the same and the first word in each is distinctly different the great weight of authority is that no infringement exists." Nims, Unfair Competition and Trade-Marks, Vol. 2, p. 758, citing Glenmore Distilleries Co. v. National Distillers Products Corp., D.C.E.D.Va.1938, 23 F. Supp. 928.

53. Judicial notice is taken of the strict state enactments attending the dispensation of alcoholic beverages.

54. "* * * I see no reason why anybody should think PM is the same as Y.P.M. or vice versa. Both brands are well advertised, and clerks in stores, bartenders in taprooms, and the purchasing public seem well aware that there are two brands of whiskey bearing those names. * * * But in the instant case, since the letter Y is missing from the defendant's trademark, my conclusion is that no such element of confusion exists (regarding the names per se) as would justify injunctive relief." Alexander Young Distilling Co. v. National Distillers Products Corp., D.C.E.D.Pa.1941, 40 F.Supp. 748, 757.

N.T. 1164–1165, 1304, 1305, 1324.

The court was favorably impressed by the testimony of defendant's vice president, R. Robert Smith, wherein the witness, particularly knowledgeable in the field of advertising, developed the concept of "Brand Personality." N.T. 1110–1115.

55. PX 10; DX 22.

56. DX 6; DX 7.

57. There is no evidence that the defendant is successor in interest to Mayer Sons & Co. "Charter Oak" mark.

were likely to cause confusion in the trade and that there was priority of use in favor of Wright & Taylor, one of plaintiff's predecessors, refused registration of the Bluthenthal, Mayer and Cushman marks: [58]

"The issue of the interference consists of the words 'Charter Oak,' 'Old Charter,' and 'Royal Charter' as applied to whiskey, and the question for determination is whether these words so nearly resemble each other as to mislead the public or deceive purchasers.

"It is believed that the word 'Charter' included in all of the marks is the most prominent feature and the one which would attract the attention of purchasers and serve as the means of identification. It must be held, therefore, that the marks so nearly resemble each other as to be likely to cause confusion in the trade. * * *" (DX 7, Paper 43–44, December 6, 1905.)

█ The court does not deem this determination deserving of extensive reliance despite plaintiff's suggestion that Patent Office decisions "are persuasive evidence 'as to what experts in the field of tradenames consider as confusingly similar.'" [59] To begin with plaintiff in other submissions, citing authority urges that expert opinion is not proper evidence: [60]

"Moreover, likelihood of confusion is still 'a question to be decided not by *expert* witnesses but by the court, and therefore is a decision not based upon testimony but upon judicial opinion.' 3 Callman, The Law of Unfair Competition and Trade-Marks (2d ed.) § 82.3(b), pp. 1570–1571. * * *" (Page 38 Plf.Br. After Trial.) (Emphasis supplied.)

" * * * At best 'the testimony of *experts* or of dealers is of little assistance.' Yale & Towne Mfg. Co. v. Alder, 154 Fed. 37, 38 (2 Cir. 1907). * * *" (Page 56 Plf. Br. After Trial.) (Emphasis supplied.)

This decision, moreover, was made at the inception of the 1905 Act [61] when it, perhaps, was sound administrative policy to reject all registrations evidencing the remotest resemblance to a mark establishing priority of use. The Commissioner had before him four marks and the record indicates that the marks were not adjudicated individually, despite the fact that Wright & Taylor stipulated,

" * * * there has never been any conflict in business between said Charter Oak brand and the other trade marks involved in the issue of this interference and particularly that there has never been any conflict between said Charter Oak brand and the Old Charter brand of Wright & Taylor. The only conflict between the brands involved in this interfer-

---

58. It is important to indicate that the finding of confusing similarity was affirmed by the Commissioner on December 6, 1905 (DX 7, Paper 43–44). Thereafter the Patent Office examined into priority of use and the final adjudication denying registration to Bluthenthal, Cushman and Mayer was decreed October 18, 1906 (DX 7, Paper 134).

59. Plf.R.Br. p. 56 citing Stardust, Inc. v. Weiss, D.C.S.D.N.Y.1948, 79 F.Supp. 274, 279.

60. "Rejection of direct evidence of 'actual experience in the trade' usually is due to a misunderstanding of the function of such evidence. Testimony on confusion and similarity is offered to show the effect of words and devices in the marked

place, not to offer opinions of witnesses as substitutes for the opinion of the court. Such witnesses are not experts; *expert testimony on the question of similarity is not competent.* 'The opinion of the witnesses in that regard * * * must yield to the more positive evidence afforded by the exhibits.' On the other hand, evidence of actual instances of deception, though not required, is 'always competent, and often illuminative.' But opinion testimony may help to corroborate testimony of witnesses who are actually confused. * * *" Nims, Unfair Competition and Trade-Marks, Vol. 2, pp. 1022–1023. (Emphasis supplied.)

61. Note 58, supra.

ence being between the brands covered in the other three applications involved; there being the conflict between the Old Charter brands and the Royal Charter brand, but none with Charter Oak." [62]

Subsequent actions of the Patent Office strongly indicate that "Charter Oak" and "Old Charter" would not have been denominated confusingly similar had the Commissioner solely before him the presently contested marks. In November 1906 shortly after the above enumerated whiskey marks were denied registration, "Charter Oak" for ale and porter was enrolled.[63] Further, no interference was proclaimed in 1935 when "Old Charter" was registered by Bernheim, notwithstanding the prior enrollment of "Charter Oak" by Continental.[64] Noteworthy too is the fact that in 1939 when Hudson's Bay [65] proposed "Royal Charter" for whiskey the Patent Office refused registration because of the apparent deceptive similarity between "Royal Charter" and plaintiff's "Old Charter"; [66] no interference was proclaimed between "Royal Charter" and Continental's "Charter Oak".[67]

The marks have been in existence for over 26 years and at the present time the litigants are experiencing success with the products on which are affixed the controversial marks.[68] Of limited significance is the 1906 stipulation noted above, wherein one of plaintiff's predecessors admitted "there has never been any conflict in business between the Old Charter mark and Charter Oak." [69]

---

62. DX 7, Paper No. 110, Stipulation dated June 14, 1906. See also DX 7, Paper No. 23, wherein Wright & Taylor would not subscribe to a similar stipulation advanced by Bluthenthal, Cushman . and Mayer.

63. DX 4. In Wardall v. Camden County Beverage Co., 45 U.S.P.Q. 530, 531 (1940) the Patent Office held that ale and whiskey are goods of the same descriptive properties:

"Appellant's registration is for whiskey, and appellee's application specifies only ale. These goods, though specifically different, are goods of the same descriptive properties, and, in considering the likelihood of confusion resulting from the concurrent use of the marks on the goods involved, it is proper to give consideration to the fact that purchasers frequently order and buy whiskey and ale by the drink and without seeing the labels or trade-marks. * * *"

64. "Charter Oak" was registered March 13, 1934 (note 7, supra); "Old Charter," February 19, 1935 (note 10, supra).

65. The Governor and Company of Adventurers of England Trading into Hudson's Bay.

66. Ex parte Hudson's Bay Co., 36 U.S.P.Q. 458 (1938) Asst. Commr.; 37 U.S.P.Q. 831 (1938) Asst. Commr.

67. "Applicant appeals from the refusal of the Examiner of Trade Marks to register the words 'Royal Charter' as a trade mark for whisky and brandy in view of a prior registration of the words 'Old Charter' for use with whisky." (36 U.S. P.Q. 458.)
No ex parte proceeding between Hudson's Bay "Royal Charter" and Continental's "Charter Oak" has been brought to the attention of the court nor has independent research disclosed one.

68. N.T. 1539–1542.

69. Note 62, supra. For the evidentiary value of such admissions see Croton Watch Co. v. Laughlin, 2 Cir., 1953, 208 F.2d 93, 96–97:
"* * * By the 1939 contract the Movado company agreed that if 'Grenchen' were added to 'Nivada,' watches so marked might come in. This was an admission that there would be no confusion between them and the registered mark 'Movado.' True, Movado did not expressly so state, and it is possible that it only meant to surrender what it thought to be its right for a consideration limited to that particular occasion. But it does not give any such explanation of its consent, and its consent was not confined to a particular importation but was general. * * * In the absence of evidence to the contrary, we think the claim is wholly unjustified that watches so marked will result in confusion. * * *
"* * * The agreement would be equally effective as an admission, even if the plaintiff were not the successor of Horowitz, the promisee. However, a mandatory injunction directing the Movado

It is, however, defendant's behavior which is pivotal on this issue. On four occasions defendant has either alleged or admitted the two marks to be confusingly similar.[70]

Defendant urges, (1) since these admissions were contained in unverified papers they may not be considered,[71] and (2) that the averments are conclusions of fact and are not evidentiary facts and hence inadmissible for,

"* * * An admission that an assertion in an opposing pleading is true, even in the same case, does not necessarily mean that all of the underlying evidential facts are true. It simply means that the matter is not presently worth contesting, and that the pleading party does not choose to litigate this particular issue at this particular time. The truth of ultimate facts is established in discovery proceedings and in trial, not in pleadings. This is not to say that a pleading party can later decide, in the same lawsuit, that it would like to litigate the matter after all; but neither does it mean that a party who is willing to concede a particular issue in one lawsuit must forevermore be held to that position in every other lawsuit. Such a rule would mean that every fact in every lawsuit would have to be fully litigated, and every trial nearly endless."[72]

These prior allegations although incapable of estoppel by judgment effect because, inter alia, not relied upon as such by plaintiff [73] are, nevertheless, accorded substantial weight.[74] It would be an affront to our judicial system and an intolerable presumption upon this court to accept defendant's cavalier approach on this matter.

Under certain circumstances defendant's view of according little or no significance to statements embodied in pleadings of other proceedings would be entirely palatable, for instance, where admissions are made in third-party complaints, third-party plaintiff having adopted completely principal complainant's allegations in order to insure indemnity in the event of an adverse decision in the main litigation.[75] In the

---

company to file its written consent to the importation would be justified only if the plaintiff has succeeded to the contract rights of Horowitz. * * *"

70. Notes and accompanying text 20, 26, 27, 28, supra.

71. "In summary, it is clear that statements in prior pleadings not signed or verified by the party, are not binding in the present action. As to confusing similarity, they are not even admissible." (Dfd.T.Br. p. 11.)
Incorporated by reference in defendant's submission after trial (Dfd.Law Br. pp. 39-40).

72. Dfd.Law Br. pp. 46-47.

73. Note 36, supra.

74. Note 69, supra; L. P. Larson, Jr., Co. v. Wm. Wrigley, Jr., Co., 7 Cir., 1918, 253 F. 914; 65 Harv.L.Rev. 818, 823-824, 1952:
"Preclusion of Inconsistent Positions. —The rule that a person is precluded from making allegations of fact inconsistent with a position he took in a previous case is not based on the policies against relitigation, *but on a desire to* *preserve the dignity of judicial proceedings by preventing the successive assertion of factually contradictory statements as the truth.* This is a form of estoppel based on the conduct of the party rather than on the court, in which respect it is similar to election of remedies. The preclusion, like election of remedies, preferably should not be applied where the first position taken did not harm or cause reliance by the other party. Unlike res judicata, it operates regardless of finality of the original proceedings or identity of the parties, and it applies only to positions taken on the facts, not inconsistent points of law. Some courts apply the rule only where the position was successfully maintained, while others do not require success if the second action has some connection with the first. The preclusion seems an undesirable restriction against decision on the merits in the second action where it is applied to facts that were not major issues in the first action, or to facts that were conjectural at that time." (Emphasis supplied.)

75. Giannone v. United States Steel Corp., 3 Cir., 1956, 238 F.2d 544; Frank R.

present setting there are no mitigating circumstances to accord these admissions anything less than the plenary consideration they deserve.

The allegations and answers were not averments pertaining to an insignificant issue. To the contrary, on each and every occasion they were the basis according defendant standing before the respective courts and administration bodies.[76] Clearly the Patent Office and the learned jurists involved in the District of Columbia 4915 suit would not have tackled the question of priority unless the marks were found to be deceptively similar, and whether this issue be conceded by the parties or determined by the courts should be of no moment where the issue is of such magnitude.[77]

Defendant's statement of policy, namely, "such a rule would mean that every fact in every lawsuit would have to be fully litigated and every trial nearly endless",[78] is utterly without merit in the present context. Would the Patent Office proceeding or the trial before Judge Holtzoff have been endless if the defendant did not contend that the marks were deceptively similar? To pose the question is to suggest the answer for there would have been no issue at all before either tribunal.[79] Furthermore, since only the marks were at issue no additional evidence would have been required.[80]

The interest of present day justice considering primarily the existence of crowded dockets and the high costs of litigation imposed on the public requires that principal contentions between parties be conclusively adjudicated in the first forum wherein the matter is judicially cognizable.

After a careful evaluation of all the aforementioned considerations the court concludes "Charter Oak" to be a colorable imitation of "Old Charter" which is "likely to cause confusion or mistake or to deceive purchasers as to the source of origin."[81]

The relief an injured litigant is entitled after establishing affirmatively validity, priority and likelihood of confusion, depends upon a careful evaluation of the equities and competing interests.[82] There are principally three interests that require consideration:

(1) Judicial tribunals must abstain from involvement in complicated decrees necessitating close surveillance and administration. Courts are not equipped nor are they particularly expert to administer adjudications requiring principally business judgment. In addition, it would be an economic waste of judicial time to indulge in such activities.

(2) The public interest, aside from the general tenet to preserve honesty and fair dealing and to secure the fruits of private enterprise is to safe-

Jelleff, Inc. v. Braden, 1956, 98 U.S. App.D.C. 180, 233 F.2d 671, 63 A.L.R. 2d 400.

76. Note 22, supra.

77. 65 Harv.L.Rev. 818, 823–824 (1952).

78. Note 72, supra.

79. Notes 22, 76, supra. To permit the contest of priority of use absent an allegation of confusing similarity would give Patent Office standing to the world, an intolerable burden for any trademark registrant. Manifestly, the Act of 1905 did not countenance such conduct.

80. Notes 2, 3, 39, 41, supra. See also Sun-Maid Raisin Growers of California v. American Grocer Co., 1930, 40 F.2d 116, 119, 17 CCPA 1034; W. E. Kautenberg

Co. v. Ekco Products Co., 1958, 251 F. 2d 628, 631, 45 CCPA 761.

81. 15 U.S.C.A. § 1114.

82. Century Distilling Co. v. Continental Distilling Co., 3 Cir., 1939, 106 F.2d 486 (complete relief); Procter & Gamble Co. v. J. L. Prescott Co., 3 Cir., 1939, 102 F.2d 773 (denial of relief); Q-Tips, Inc. v. Johnson & Johnson, 3 Cir., 1953, 206 F.2d 144 (denial of an accounting); Anheuser-Busch, Inc. v. Du Bois Brewing Co., 3 Cir., 1949, 175 F.2d 370 (plaintiff denied relief, defendant restricted to market it had occupied as of date action commenced); Cohn & Rosenberger, Inc. v. Kaufman & Ruderman, Inc., 1952, 280 App.Div. 241, 113 N.Y.S.2d 62 (defendant required to display mark in conjunction with corporate name).

guard to the individual the right to buy what he thinks he wants without demanding justification for his preference notwithstanding that the choice may be capricious or dictated by ignorance.[83] Although the test for determining consumer deception is couched in terms of likelihood of public confusion, the public interest is not the primary rationale behind trademark protection.[84] This is graphically portrayed by two important factors attending trademark litigation: First, the proceeding is solely between the contesting parties and thus the public has no standing either to initiate suit or as amicus.[85] Secondly, since the suit is adversary courts may judicially sanction employment of the contested marks despite the finding of public confusion where for various reasons the party entitled to relief has forfeited it through the interplay of various equitable principles.[86] Tribunals have on occasion, however, sua sponte considered the likelihood of public deception and afforded appropriate relief.[87]

▇▇▇ (3) Manifestly, it is the interests of private litigants founded upon basic economic and social concepts, that are accorded the principal protection.[88] Mr. Justice Frankfurter has stated the owner of a mark is entitled to protection against one poaching upon the "commercial magnetism of the symbol he has created." [89]

The present record discloses that between 1934 and plaintiff's notice of infringement in January 1938 defendant was selling whiskey under the mark "Charter Oak". The documentary evidence represented by warehouse receipts is unassailable [90] and the court credits the testimony of defendant's witnesses who stated they remembered sales of "Charter Oak" during this period.[91]

83. Eastern Wine Corp. v. Winslow-Warren, Ltd., 2 Cir., 1943, 137 F.2d 955; see also concurring opinion Frank, J., in Standard Brands v. Smidler, 2 Cir., 1945, 151 F.2d 34, 37.

84. Standard Brands v. Smidler, supra. Developments in the Law Trade-Marks and Unfair Competition, 68 Harv.L.Rev. 814, 816, 885–893 (1955).

85. 68 Harv.L.Rev. 885–893 (1955).

86. "However, when the public is confused by the dual use of the trade-mark, the effect of applying personal defenses against its owner will be only to perpetuate this confusion. Thus in Procter & Gamble Co. v. J. L. Prescott Co., the court held the plaintiff to be barred by laches and refused an injunction, although there was evidence of substantial confusion among grocers and consumers between the names 'Chas-O' and 'Chipso,' both used on soap. Where the plaintiff's suit is dismissed because of unclean hands, not only is confusion tolerated, but the plaintiff can continue to mislabel or falsely advertise his product. Further, nothing will prevent the defendant from joining the plaintiff in practicing the same deception on the public. Thus where the plaintiff's figless laxative was trade-marked 'Syrup of Figs,' the result of the court's refusal to enjoin the defendant was that there might be two misbranded products on the market instead of one." 68 Harv.L.Rev. 814, 886–887 (1955).

87. Stahly, Inc. v. M. H. Jacobs Co., 7 Cir., 1950, 183 F.2d 914, certiorari denied 1950, 340 U.S. 896, 71 S.Ct. 239, 95 L.Ed. 650.

88. Eastern Wine Corp. v. Winslow-Warren, Ltd., supra; 68 Harv.L.Rev. 814, 816, 885–893 (1955).

89. " * * * The extent to which the owner of such a mark is given exclusive rights in it is determined by a tension between the desire to secure to producers the benefits of their labors by preventing consumer deception as to the source of goods, and the desire to keep free the means of expression necessary for effective competition. The public interest in preventing consumer deception or injury has rarely been thought of as the primary rationale behind trade-mark protection; rather, such deception or its likelihood has been taken to be the test of injury to the private right of the trade-mark owner. * * * " 68 Harv. L.Rev. 814, 816, 885–893 (1955). See also Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 1942, 316 U.S. 203, 205, 62 S.Ct. 1022, 86 L.Ed. 1381.

90. DX 12.

91. N.T. 586, 588, 608, 610, 612, 617, 618, 666, 895, 897, 898, 928, 934, 952, 956, 959–960, 984, 987, 1014, 1052, 1152, 1208, 1209, 1212, 1240, 1251; DX 13, DX 18.

The paucity of documents on this issue has been adequately explained by the intervening years during which defendant's plants and offices were moved, records were destroyed and key witnesses died.[92]

The first evidence of "Old Charter" production after prohibition occurred in 1937.[93] The record indicates that in 1936 plaintiff's predecessor in interest learned of Continental's registration;[94] however, the first communication with Continental did not occur until January 1938.[95]

When defendant refused to accommodate plaintiff and cancel its mark, plaintiff instituted cancellation 3436.[96] Despite the fact defendant desired to contest the issue at that time, plaintiff withdrew the proceeding without prejudice over defendant's objection.[97]

Plaintiff suggests the reason for abandoning cancellation 3436 was occasioned by an investigation which exhibited that defendant was not using the mark; therefore, continuing the proceeding would be an unwarranted financial burden since it was fully protected by the January 1938 infringement notice in the event Continental thereafter used the mark.[98]

To ascertain whether Continental was using the mark, Mr. Seasonwein, at that time trademark counsel for plaintiff, testified he "had personally examined directories and other published material and had found no listing of 'Charter Oak'; he had also been advised by Washington counsel that no 'Charter Oak' certificate of label approval had been issued to defendant," and that he had reported these findings to his superior, Mr. Heymsfeld, who made the decision to discontinue the proceeding.[99]

The evidence, however, belies plaintiff's proffer. To begin with, plaintiff's vice-president, Ralph T. Heymsfeld, admits Dr. Marks informed him that Continental was using the mark.[100] In addition, Mr. Seasonwein stated that on April 20, 1938, he purchased a bottle of "Charter Oak" whiskey distilled by Springdale Distilling Co., (Springdale), and although he discovered that Springdale had obtained approval for use of the label did not pursue the matter further.[101] Specifically, he did not investigate to determine whether there were any sales of "Charter Oak" whiskey by Continental to Springdale. Mr. Seasonwein's testimony on this point is especially worthy of note: "When I found that Continental also had a registration, it seemed to me that the more important person was Continental rather than Springdale."[102] This testimony demonstrates that Conti-

92. N.T. 963, 1016, 1054–1055, 1060, 1119, 1276.

93. N.T. 26; DX 25; PX 9A and B, PX 62.

94. DX 37A and B.

95. PX 12.
"The Anheuser-Busch Brewing Association is the predecessor corporation to Anheuser. Although for accuracy this opinion will frequently refer to the Association rather than to Anheuser, it is important to note that, in legal effect, the actions of the Association are those of Anheuser for the purposes of the case at bar." Anheuser-Busch, Inc. v. Du Bois Brewing Co., 3 Cir., 1949, 175 F.2d 370, 372, footnote 4.

96. DX 2.

97. DX 2.

98. N.T. 1455–1456; Plf.Br. after Tr. pp. 21–23.

99. Plf.Rep.Br. p. 36; N.T. 65–67, 1455, 1465–1466.

100. "Q. If you want to look at the memorandum, just ask me for it. I am going to refer to certain sentences:
"'I (meaning Mr. Heymsfeld) said that I did not see why any expense would be justified if he (meaning Dr. Marks) were not using the mark.
"'He said, Oh, we are using the mark.'
"Is that your recollection? A. That is correct, yes." (N.T. 1462–1463.)
See also N.T. 1450, 1470.

101. N.T. 136, 1415; letter received by Seasonwein from Washington counsel disclosed certificates of label approval were issued to Springdale Distillery Co. as follows: June 8, 28, 1936; February 4, 8, March 15, 16, June 26, August 27, 1937 (N.T. 1417).

102. N.T. 136.

nental as a member of the Publicker complex commanded Seasonwein's respect.

It is also interesting that Seasonwein, in the aforementioned statement inadvertently equated label approval with registration. There is no evidence whatever which would indicate a "Charter Oak" registration by Springdale.[103] Therefore, Seasonwein having knowledge that label approval for "Charter Oak" issued to Springdale and knowing that the only outstanding registration of "Charter Oak" belonged to Continental[104] for whom Seasonwein admittedly professed respect, it simply did not make good sense to allow the matter to remain in that posture.

The present record uncontrovertibly demonstrates that Continental did in fact during the period under consideration sell whiskey to Springdale[105] and although there is no documentary evidence that Springdale purchased "Charter Oak" as such, a valid inference to this effect may be drawn from the credible testimony[106] and a consideration of all the concomitants surrounding these transactions.[107] The fact of the matter is, that Seasonwein did nothing with regard to the Springdale operation after he was advised of the certificates of label approval.[108] He did not even apprise Heymsfeld of this information, who according to plaintiff, was responsible for the decision to discontinue cancellation 3436.[109]

Considering the aforementioned factors, namely, the statement by Dr. Marks that Continental was using the mark;[110] the sales of "Charter Oak" in bottles by Springdale;[111] sole registration of "Charter Oak" by Continental;[112] defendant's vehement objection to withdrawing the proceedings;[113] and that Schenley and Publicker are two giants in the industry, reveal rather strongly that the explanation for discontinuance was other than economics and nonuse of the mark by Continental.[114]

The withdrawal of cancellation 3436 placed defendant in a vulnerable position. The effectiveness of defendant's registration was indeed precarious without

103. The 1936 report of Mida's Trade Mark and Patent Bureau, Incorporated to Bernheim discloses sole registration of the name "Charter Oak" to Continental. DX 37 A and B.

104. DX 8 A.

105. N.T. 965–966. From 1934–1939 sales totalled $1,513,034.82 (N.T. 968).

106. N.T. 935, 1257.

107. Notes 101, 105, supra.

108. Note 102, supra.

109. N.T. 136, 1466–1467, 1497–1499.
"Q. When you (Seasonwein) got the information from the Washington lawyers as to the certificates of label registration issued to Springdale for 'Charter Oak' whiskey did you bring that to the attention of Mr. Heymsfeld? A. No, sir.
"Q. You did not? A. It seemed to me to be insignificant.
"Q. Did you investigate the operations of the Springdale Distilling Company in the production and bottling of the 'Charter Oak' whiskey? A. No, I did not. As a matter of fact, as you know, when you ask questions and get someone to think about a subject, you get to think about why, and I felt that was one of Mr. Kalish's problems.
"Q. Didn't you find out that Springdale was bottling 'Charter Oak' whiskey which they bought in bulk under that name from Continental Distilling Corporation? A. I never found that out; I never investigated that. I know that you have claimed that, but I have never seen any proof of it." (N.T. 1497.)

110. Note 100, supra.

111. Note 101, supra.

112. DX 8A, DX 37A and B.

113. Note 97, supra.

114. Other avenues of pursuit indicate that perhaps the reason for discontinuance was the feeling among the Schenley hierarchy that they would have trouble proving the mesne transfers required to establish priority. The record reveals that during the pendency of cancellation 3436 plaintiff was engaged in an interference proceeding with the mark "Royal Charter" (36 U.S.P.Q. 458, Asst.Commr. 1938; 37 U.S.P.Q. 831, Asst.Commr. 1938). This controversy was compromised between the parties and plaintiff was not forced to bare the "Old Charter" chain of title.

knowledge of "Old Charter's" next move if one were forthcoming. Moreover, if it desired to continue in the Patent Office as a petitioner it could not deny that the marks were confusingly similar as it had in answer to plaintiff's 3436 petition.[115]

■ Defendant could have, however, brought a declaratory judgment action if it desired to maintain its denial of petitioner's 3436 allegation of confusing similarity.[116] Defendant instead chose to proceed in the same forum initiated by plaintiff.

During the 40's while the marks were in litigation, the parties merchandised whiskey under the contested marks.[117] The present infringement action was commenced on June 28, 1951.[118]

■ The question of deceptive similarity is one of degree capable of variation mainly by three determinants that must be considered to properly formulate a decree. Marks are less likely to cause confusion as to source where (1) they are not identical; (2) employed on products of differing commercial properties; and (3) employed on products marketed for dissimilar consumer appeal.[119]

The marks are not and never have been identical, and although they are presently employed on bourbon whiskey the respective packages are merchandised in distinctly different price categories.[120] In addition, over the years plaintiff's product has become associated with Kentucky distilling, defendant's with Pennsylvania.[121]

■ An absolute injunction and an accounting, would, under the circumstances, be too harsh considering that plaintiff could have had this controversy

---

115. Note 17, supra.

116. A charge of infringement is peculiarly appropriate subject matter for a declaratory judgment action. 6 Moore Fed. Prac. ¶ 57.20.

117. DX 20; N.T. 1300; PX 25. The evidence discloses that the whiskeys bearing the contested marks are aged between 6–7 years before sale. Thus the date of distillation is important for a proper evaluation of product activity. For example DX 43, a bottle of "Charter Oak" bonded in bond bourbon, 4/5 quart, exhibits the following dates on its revenue stamp: "Made 1941"—"Bottled 1947".

118. Complaint.

119. Flintkote Co. v. Tizer, 3 Cir., 266 F. 2d 849.

120. Comparative pricing:

| Old Charter | | | | Charter Oak | |
|---|---|---|---|---|---|
| April 1, 1950 | Mich. | 4/5 | (86 Pr.) $5.42 | 100 Pr. in Bond | $4.37 |
| July 17, " | Pa. | " | " 6.04 | " 4 yr. | 4.83 |
| " | W.Va. | 5th | " 4.90 | " 5th | 3.80 |
| April 1, 1958 | Pa. | 4/5 | " 6.47 | " 4/5 4 yrs. | 5.83 |
| | | | | 86 Pr. 4/5 | 4.43 |

June 1958 Orlando, Fla. 5th (86 Pr.) Old Charter list $6.40 discount price $4.59; 5th (86 Pr.) Charter Oak list $4.65 discount price 3 bottles for $10. (N.T. 1098–1104) (DX 41E.)

---

121. Label approval for Kentucky whiskey under the brand "Charter Oak" issued to Continental in December 1947 (PX 57). This is the only evidence indicating defendant utilization of Kentucky whiskey. Defendant explained this use as emanating from World War II restrictions which depleted Continental's reserves, necessitating open market purchases (Stipulation, Sept. 19, 1958).

In view of the circumstances surrounding this transaction and no evidence showing that defendant's reasons for using Kentucky whiskey were other than stated, the court affords this event minor consideration and finds that Continental's "Charter Oak" whiskey has become associated with Pennsylvania distilling.

It is significant that plaintiff attributes to this matter no special application for relief. (Pre-Tr.Conf. pp. 8–9.)

determined twenty years ago;[122] thus to now require defendant to completely abandon its market and possibly permit plaintiff to achieve an unjustified windfall would afford plaintiff more than it deserves.[123] In denying plaintiff the relief sought, the court has considered plaintiff's allegation that it was not required to bring an infringement action before it commenced the present suit for (1) defendant was not making extensive use of its mark prior to the commencement of this action, and (2), the controversy was in litigation in the Patent Office and the courts during the entire period.

Plaintiff's initial contention relevant to nonuse by Continental is answered by the uncontrovertible proof in the record. The court credits defendant's testimony indicating use of the mark since 1934.[124]

Plaintiff's second averment that it need only litigate in one arena at a time[125] is without merit. The improvident and completely unjustified withdrawal of cancellation 3436 over protestations of defendant set in chain the lengthy and expensive truncated litigation which plaintiff seeks now to avail itself as exoneration for delay in bringing to a prompt determination the contested issues.[126] Therefore in the application of the traditional discretion of equity in framing decrees, plaintiff is denied the plenary relief it seeks.[127]

 Against this background, limited injunctive relief will be granted. The defendant will be permitted to display its mark "Charter Oak" only in conjunction with its corporate name.[128] The details of affixing defendant's corporate name to its mark will be left to the ingenuity of experienced counsel and incorporated in the order.[129] Plaintiff is denied an accounting.[130]

---

122. Notes 16, 17, 18, supra.

123. Procter & Gamble Co. v. J. L. Prescott Co., 3 Cir., 1939, 102 F.2d 773; Valvoline Oil Co. v. Havoline Oil Co., D.C.S.D.N.Y.1913, 211 F. 189; Nims, Unfair Competition and Trade-Marks, Vol. 2, § 416, fn. 11, p. 1306.

124. Notes 90, 91, 117, supra.

125. Taylor Engines, Inc. v. All Steel Engines, Inc., 9 Cir., 1951, 192 F.2d 171, 174–175; Noll v. Rinex Laboratories Co., D.C.N.D.Ohio, 1935, 25 F.Supp. 239, 242, affirmed 6 Cir., 1938, 99 F.2d 1013; Nims, Unfair Competition and Trade-Marks, Vol. 2, p. 1293; Plf.Tr.Br. pp. 48–50.

126. If plaintiff had proceeded with cancellation 3436 the issues would have been in proper posture from the standpoint of both plaintiff and defendant; thus obviating the costly and time-consuming piecemeal litigation that followed.

127. "Injunctions in these cases should be practical as Judge Woodward said, but they should be no broader than is necessary to give adequate protection to the plaintiff. * * * " Nims, Unfair Competition and Trade-Marks, Vol. 2, p. 1156.
 See also 68 Harv.L.Rev. 814, 885–895 (1955); note 82, supra.

128. "* * * We believe that plaintiff's legitimate interests will be protected and defendant will suffer no undue injury if defendant is prohibited from displaying its mark in a script form and is required to accompany use of its mark by its corporate name. * * *" Cohn & Rosenberger, Inc. v. Kaufman & Ruderman, Inc., 1952, 280 App.Div. 241, 113 N.Y.S. 2d 62, 63.
 "A trade-mark identifies the origin of goods, not their nature. Trade-mark infringement involves confusion of origin, not confusion of goods. * * *" Nims, Unfair Competition and Trade-Marks, Vol. 1, p. 671.
 See also Bond Stores, Inc. v. Bond Stores, Inc., 3 Cir., 1939, 104 F.2d 124.

129. "* * * Plaintiff is apprehensive that an adjudication that the red oval mark was free to defendant's use 'would permit Defendant to reduce the size of its oval and thereby greatly increase the confusion of Defendant's mark with Plaintiff's.' If defendant undertook to do this, we would have quite a different case, for a very small red oval figure might well be deceptively similar to the plaintiff's red circle mark, * * *." Mishawaka Rubber & Woolen Mfg. Co. v. Panther-Panco Rubber Co., 1 Cir., 1946, 153 F.2d 662, 665. See Bond Stores, Inc. v. Bond Stores, Inc., supra.

130. McLean v. Fleming, 1877, 96 U.S. 245, 258, 24 L.Ed. 828; Best Foods v. Hemphill Packing Co., D.C.Del.1925, 5 F.2d 355, 358; Q-Tips, Inc. v. Johnson & Johnson, 3 Cir., 1953, 206 F.2d 144.

The court deems that the above adjudication comports with the various legitimate interests previously enunciated, and the attendant equities.

The foregoing opinion is adopted as the court's findings of fact and conclusions of law pursuant to F.R.Civ.P. 52 (a), 28 U.S.C.A.

Let an order be submitted.